Paul GILBROOK; Michael Garrison; Don Herr; Hal Raphael; Dana Bowler; Joe Wilson, Plaintiffs–Appellees,

Davis, Reno & Courtney, Plaintiff–Intervenor–Appellee,

v.

CITY OF WESTMINSTER; Charles V. Smith; Craig Schweisinger; Tony Lam; Don S. Anderson; John T. Demonaco; Brian Mayhew, Defendants–Appellants.

**840**

Paul Gilbrook; Michael Garrison; Don Herr; Hal Raphael; Dana Bowler; Westminster Fire Fighters Association, Local 2425; Joe Wilson; International Association of Fire Fighters, AFL–CIO, Plaintiffs–Appellants,

Davis, Reno & Courtney, Plaintiff–Intervenor–Appellee,

v.

City of Westminster; Charles V. Smith; Craig Schweisinger; Tony Lam; Don S. Anderson; John T. Demonaco; Brian Mayhew, Defendants–Appellees.

Paul Gilbrook; Michael Garrison; Don Herr; Hal Raphael; Dana Bowler; Westminster Fire Fighters Association, Local 2425; International Association Of Fire Fighters, AFL–CIO; Joe Wilson, Plaintiffs–Appellees,

Davis, Reno & Courtney, Plaintiff–Intervenor–Appellee,

v.

City of Westminster; Charles V. Smith; Craig Schweisinger; Tony Lam; Don S. Anderson; John T. Demonaco; Brian Mayhew, Defendants–Appellants.

Nos. 96–56306, 96–56375, 97–55314.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted March 1, 1999.

Decided May 21, 1999.

As Amended on Denial of Rehearing and Rehearing En Banc July 15, 1999.*

* Judge Graber has voted to deny Appellants' petition for rehearing en banc and Intervenor's petition for rehearing en banc, and Judges Browning and Wiggins have so recommended.

Alison M. Turner, Greines, Martin, Stein & Richland, Beverly Hills, California, for the defendants-appellants.

Lester Ostrov and Jan G. Levine, Fogel, Feldman, Ostrov, Ringler & Klevens, Santa Monica, California, for the plaintiffs-appellees.

Duane W. Reno, Davis & Reno, San Francisco, California, for the plaintiff-intervenor-appellee.

Before: BROWNING, WIGGINS, and GRABER, Circuit Judges.

## OPINION

GRABER, Circuit Judge:

This action involves claims by six individual firefighters against the City of Westminster (City) and ten individual defendants, each of whom was an officer and employee of the City. The City discharged four plaintiffs and disciplined the other two, after plaintiffs became embroiled in a bitter public controversy concerning the City's funding of fire protection services, the firefighters' use of public funds, and the political activities of the firefighters' union. Plaintiffs brought this action under 42 U.S.C. § 1983, alleging that defendants, individually and collectively, had retaliated against them for exercising their First Amendment rights of free speech and association. They also alleged that defendants had defamed them by accusing them publicly of criminal wrongdoing. After a jury trial and post-trial motions, four related matters come to us: (1) an appeal by certain defendants against whom the jury rendered special verdicts; (2) a cross-appeal by certain plaintiffs against whom the district court entered judgments as a matter of law; (3) an appeal by certain defendants regarding the attorney fees and costs awarded to two prevailing plaintiffs; and (4) an intervention by plaintiffs' trial counsel, challenging the district court's award of fees directly to their former clients.

## I. FACTUAL AND PROCEDURAL HISTORY

### A. *Factual History*

Our recitation of facts is governed by two principles. First, with respect to

those parties in favor of whom the jury returned verdicts, we view the evidence in the light most favorable to each prevailing party. *See Ace v. Aetna Life Ins. Co.*, 139 F.3d 1241, 1246 (9th Cir.) (stating that principle with respect to review of a decision to grant a motion for judgment as a matter of a law), *cert. denied,* —— U.S. ——, 119 S.Ct. 338, 142 L.Ed.2d 279 (1998). Second, with respect to those parties against whom the district court directed a verdict, we view the facts in the light most favorable to the nonmoving party. *See Washington v. Lambert,* 98 F.3d 1181, 1185 (9th Cir.1996) (stating principle).

### 1. *The Election and the Reorganization of the City's Fire Department*

This dispute began in November 1992, when the City held elections for the Mayor and the City Council. At that time, plaintiffs in this action—Paul Gilbrook, Michael Garrison, Don Herr, Hal Raphael, Dana Bowler, and Joe Wilson—were veteran employees of the Westminster Fire Department and members of the Westminster Fire Fighters Association, the firefighters' union. Gilbrook was the union's president, and Garrison was its public information officer. The union had been active in local politics for nearly 20 years.

Although in the past the union had supported the incumbent mayor, Charles Smith, the union decided to endorse Smith's opponent, Joy Neugebauer, in the 1992 election. The union's members campaigned actively for Neugebauer, undertaking such efforts as walking precincts, gathering signatures, and distributing campaign literature. Garrison ran Neugebauer's campaign office. Despite the firefighters' efforts, Smith emerged the victor.

During the campaign, Smith expressed openly his bitterness toward the union for its defection. In labor contract negotiations coinciding with the election, Smith told Gilbrook and Garrison: "If you make [the staffing of fire stations] a political issue in my upcoming election, I'll have your ass." City Councilor Craig Schweis-

inger later told Garrison and Gilbrook: "[The Mayor] is anti-fire now. You people supported your—you're going to support Joy Neugebauer. We have problems here with this contract."

In the spring of 1993, following Smith's re-election, the Financial Review Committee (FRC), a citizens' committee appointed by the City Council to review the City's budget, produced an Interim Report on Fire Services. The FRC's report recommended, among other things, significant cuts in fire services, the dismissal of firefighters, and the curtailment of the firefighters' political activities. The report further recommended that the City explore privatizing fire services and that the City's fire department be excluded from any future contractual bidding for fire services unless the firefighters desisted from their political activities. Also of particular concern to the FRC was the fire department's practice with respect to overtime pay, which the FRC described as "abusive" and as to which it recommended an internal audit.

The FRC's report and recommendations triggered a political firestorm. The union went on the offensive, producing a video explaining the FRC's recommendations and collecting over 14,000 signatures to protest the proposed budget cuts. The anti-firefighter contingent was equally vocal. On many occasions, Mayor Smith publicly accused the firefighters of abusing the overtime system. Councilor Schweisinger called Gilbrook a "Jimmy Hoffa" and Garrison a "David Koresh" and also declared that there was a "cancer in the Fire Department ... and we're going to cut it out."

Despite the union's protest, in July 1993 the City Council voted to reorganize the fire department by laying off six firefighters, removing a truck from service, and increasing paramedic services. Councilor Schweisinger told Herr, the then-Fire Chief, and a private citizen, Rebecca Danna, that the budget cuts were "political

retribution" for the firefighters' campaign against Smith.

In response to the City Council's actions, the union joined forces with a citizens' group and mounted a recall campaign against Mayor Smith and City Council members Schweisinger, Charmayne Bohman, and Tony Lam, all of whom had voted for the reorganization of fire services. The recall election was held almost a year later, in June 1994, and the voters defeated the proposed recall by a two-to-one margin.

### 2. *Audit of the Fire Department*

#### (a) *The First Peat Marwick Report*

In July 1993, the City hired KPMG Peat Marwick to study the City's payroll and overtime practices. The City's Finance Director, Brian Mayhew, coordinated the City's efforts. In its initial report, dated September 1, 1993, Peat Marwick found that the ratio of overtime expenses to regular salaries was significantly higher in the fire department than in the City's other departments. Peat Marwick traced the inflated overtime expenditures to an informal practice of "shift trading," which allowed firefighters to receive overtime for working unscheduled shifts irrespective of whether they had worked their regularly scheduled hours. Despite that finding, the report concluded that "it does not appear that [the fire department's] personnel have engaged in activities which were not allowed under their current [labor] contracts." The report explained that the City would have to revise its current policies to reduce overtime expenses.

Following the issuance of the September 1 report, the City asked Peat Marwick to continue its study, this time focusing on the fire department and identifying the sums of overtime pay received by individual firefighters. City officials, led by City Attorney Richard Jones, newly appointed Fire Chief John Demonaco, Finance Director Mayhew, and Mayor Smith, also convinced the Orange County District Attorney's Office to investigate the fire department for possible criminal conduct in connection with the department's overtime and payroll practices.

#### (b) *The "Personnel Transaction Form" Policy*

In November 1993, Fire Chief Demonaco launched an "in-depth" investigation of the fire department's compliance with the City's policy requiring firefighters to file a Personnel Transaction Form (PTF) when taking paid leave. According to the City's policy, when a firefighter used sick leave, vacation time, or other compensated time off, the firefighter was required to submit a PTF to the personnel department to document the absence. On receipt of the PTF, the personnel department would deduct leave time from the employee's "leave bank." The hours in the "leave bank" had a monetary value, which the employee could "cash out" at certain times of the year. Unreported PTFs, therefore, resulted in a financial loss to the City.

Notwithstanding the obvious import of the PTF, many members of the fire department were unaware of the precise rules governing its use. Several plaintiffs testified that they never had seen a written PTF policy and had filed PTFs based on their personal understanding of what they thought the policy required. Even the fire department's timekeeper, Brian Lawler, who was responsible for recording PTFs, testified that he had never seen the PTF policy in writing and characterized it instead as a "practice."

Throughout the course of his investigation, Demonaco kept City officials informed about his findings in closed-door City Council meetings. Although Demonaco's investigation focused initially on Gilbrook, the PTF inquiry spread to other members of the fire department. At the direction of City Attorney Jones, the issue of PTF compliance became part of Peat Marwick's audit of the fire department. The final Peat Marwick report, dated April 12, 1994, found more than 1,400 instances

of missing PTFs, involving 9,500 leave hours. The report concluded that the firefighters' failure to document PTFs had cost the City more than $4.8 million over the preceding eight years. Nonetheless, the District Attorney informed the City on April 29, 1994, that there was insufficient evidence to support criminal charges against any members of the fire department.

### 3. *Increasing Public Rhetoric*

Throughout the winter and spring of 1994, the currents of the PTF investigation crossed frequently with the currents of the recall election. In her statement opposing the recall petition, Councilor Bohman accused the firefighters of "manipulating" the overtime system. Councilor Lam similarly alleged that the firefighters were "milking" the system and "rip[ping] off" the taxpayers. Mayor Smith continued his assault on the firefighters, accusing them of undertaking a "massive scheme" to cheat the taxpayers out of thousands of dollars. Councilor Schweisinger was even more blunt; he promised to "get" Gilbrook and Garrison and warned citizens not to believe the firefighters, because they were "crooks" and "thieves."

### 4. *The Candlewood Fire*

On January 28, 1994, a fire broke out in a home on Candlewood Street, resulting in the death of a child. Plaintiff Raphael, the battalion chief at the scene, told Garrison that he thought that the tragedy could have been averted had he had the proper equipment and staff. After further discussions with firefighters who were at the scene, the union decided to issue a press release stating in part: "This tragedy is the direct result of the Mayor and [City] Council placing politics above the safety of the people."

Shortly thereafter, the City suspended Garrison, the union's information officer, who had issued the press release. The City discharged Garrison several months later, citing as the reasons for his discharge Garrison's issuance of the press release and his failure to comply with the PTF policy.

### 5. *Disciplinary Action Against Other Plaintiffs*

In February 1994, the City dismissed Gilbrook, accusing him of "embezzl[ing]" the City's funds, violating the PTF policy, and driving a fire truck with a suspended license. On April 14, 1994, two days after Peat Marwick issued its final report, the City fired Raphael, Herr, Wilson, and Bowler for "fraudulently" accumulating paid leave time in violation of the PTF policy. The City also charged Raphael and Herr with "gross negligence" for permitting Gilbrook to drive with a suspended license. On the day of the recall election, June 7, 1994, another 40 firefighters, all of whom had violated the PTF policy, received notices of discipline, but none lost their jobs.

The proceedings that led to plaintiffs' terminations involved a multi-tiered process that lasted several months. First, Fire Chief Demonaco initiated the disciplinary action against each plaintiff by sending a notice of termination, outlining the reasons for the discharge. Assistant City Manager Don Anderson then conducted plaintiffs' *Skelly* hearings,[1] in each instance affirming Demonaco's recommendation to discharge. Finally, the then-City Manager, Robert Huntley, reviewed the recommendations of discharge and made the final determination whether to ratify, reject, or modify the disciplinary action.[2]

---

**1.** The term "Skelly hearing" derives from *Skelly v. State Personnel Board*, 15 Cal.3d 194, 124 Cal.Rptr. 14, 539 P.2d 774, 783–84 (1975), in which the California Supreme Court held that a civil service employee has a property interest in the continuation of em-

ployment, an interest that is protected by the right of due process.

**2.** The disciplinary process in this case was truncated. Ordinarily, after the City Manager rules, the matter goes to a third-party person-

Huntley sustained the terminations of Gilbrook, Garrison, Herr, and Raphael, but reinstated Wilson and Bowler, finding that dismissal was "too severe" a penalty for their respective PTF-policy violations. Instead, Wilson and Bowler each received a 30–day suspension and a reduction in pay for one year.

### 6. *Contracting Out of Fire Services*

In mid–1995, the City Council voted to disband the fire department and decided instead to contract for fire services with the Orange County Fire Authority (OCFA). A provision of that contract provided that the OCFA would not hire any firefighter whom the City had discharged. As a result, Gilbrook, Garrison, Herr, and Raphael, the only plaintiffs whom the City had terminated, could not seek employment with the OCFA, while the City's remaining firefighters were able to do so.

### B. *Procedural History*

On March 31, 1994, the union, Gilbrook, and Garrison brought this action under 42 U.S.C. § 1983 against the City and 10 individual defendants: Mayor Smith; City Council members Schweisinger, Bohman, and Lam; former City Managers Jerry Kenny and Huntley; City Attorney Jones; Assistant City Manager Anderson; Finance Director Mayhew; and Fire Chief Demonaco. Gilbrook and Garrison alleged that each of the individual defendants (1) had terminated them in retaliation for having exercised their rights of free speech and association (individual liability), (2) had conspired to retaliate against them for exercising those rights (co-conspirator liability), and (3) had denied them equal protection under the law, individually and as a co-conspirator. Gilbrook and Garrison also asserted state-law claims of slander per se against the individual defendants. *See* Cal. Civ.Code § 46 (defining slander).

Finally, plaintiffs alleged that the City was municipally liable for the individual defendants' actions. In September 1994, Gilbrook and Garrison amended their complaint, adding as plaintiffs Herr, Raphael, Bowler, Wilson, and 21 other firefighters.

On July 21, 1995, the district court issued a pretrial conference order bifurcating the trial. The order provided that the claims of Gilbrook, Garrison, Herr, Raphael, Wilson, Bowler, and the union would be tried first, in four phases: liability, compensatory damages, punitive damages, and municipal liability. The trial involving the remaining 21 plaintiffs would occur later.

The liability phase began before a jury on July 25, 1995. At the close of plaintiffs' case-in-chief, defendants moved for judgment as a matter of law under Federal Rule of Civil Procedure 50(a). The district court granted that motion with respect to Garrison's civil rights claims against all defendants. As to the other plaintiffs' claims of retaliation, the district court entered judgment in favor of all defendants except Demonaco, Anderson, and Huntley, who had played direct roles in the disciplinary process. With respect to the claims of conspiracy to retaliate and of denial of equal protection under the law, the district court denied the motion as to all defendants. Finally, with respect to plaintiffs' various claims of slander per se, the district court ruled that only two statements were actionable as a matter of law: (1) Schweisinger's statement that Gilbrook was "a Jimmy Hoffa" and (2) Schweisinger's statement that Gilbrook and Garrison were "crooks" and "thieves."

The surviving claims then went to the jury which, by special verdict, returned a hodgepodge of results. Herr, Wilson, and Bowler prevailed on their claims of retaliation against Demonaco and Anderson, but not against Huntley. Those three plaintiffs also prevailed on their claims of con-

---

nel commission or arbitrator. That third party conducts an evidentiary hearing and makes a recommendation to the City Council, which then makes a final decision on discipline. Here, however, the parties agreed to stay ar-

bitration. As a result, plaintiffs' disciplinary cases never came before the City Council. Thus, for purposes of this case, Huntley was the final decision-maker in the City's termination process.

spiracy to retaliate and their equal protection claims against Demonaco, Anderson, Smith, Schweisinger, Lam, and Mayhew, but not against Kenny, Huntley, Jones, and Bohman. Raphael succeeded only on his equal protection claim, while Gilbrook succeeded on none of his civil rights claims. Finally, the jury found that Schweisinger was liable for calling Gilbrook a "Jimmy Hoffa," but was not liable for referring to Gilbrook and Garrison as "crooks" and "thieves." Following the liability phase, the jury awarded the prevailing plaintiffs compensatory and punitive damages. At the final stage, the district court held that the City was municipally liable for the actions of Smith, Schweisinger, and Lam.

After the trial ended, defendants again moved for judgment as a matter of law and for a new trial under Federal Rule of Civil Procedure 50(b). The district court denied that motion with respect to (1) the jury's verdict in favor of Herr and Wilson on their claims of retaliation and conspiracy to retaliate and (2) the jury's verdict in favor of Gilbrook on his claim of slander per se. With respect to Bowler's retaliation claims, the district court agreed with defendants that there was insufficient evidence to prove that Bowler had engaged in any protected political activity. However, instead of entering judgment as a matter of law in favor of defendants, the district court ordered a new trial on the ground that defendants had failed to make a timely Rule 50(a) motion with respect to Bowler at the close of plaintiffs' case-in-chief. Finally, the district court granted defen-

dants' Rule 50(b) motion with respect to plaintiffs' equal protection claims, but conditionally granted a new trial as to those claims under Federal Rule of Civil Procedure 50(c).[3]

Once the post-trial dust settled, the only plaintiffs to have prevailed on their civil rights claims were Herr and Wilson. They moved for attorney fees and costs under 42 U.S.C. § 1988(b). The district court granted that motion, awarding attorney fees and costs in the amount of $977,-166.68 directly to Herr and Wilson.

We now have before us appeals from the various judgments entered by the district court. First, defendants[4] contest the jury's verdicts in favor of Herr, Wilson, and Gilbrook and the new trial ordered as to Bowler. Second, plaintiffs[5] cross-appeal, challenging the district court's entry of judgment as a matter of law on their equal protection claims and on Garrison's civil rights claims. Plaintiff Bowler also cross-appeals, contesting the new trial ordered as to his retaliation claims. Third, defendants seek review of the amount of attorney fees and costs awarded to Herr and Wilson. Finally, plaintiffs' trial counsel, Davis, Reno & Courtney, intervenes on appeal, claiming that the district court should have awarded fees and costs directly to counsel, instead of to Herr and Wilson.

## II. DEFENDANTS' MAIN APPEAL (NO. 96–56306)

### A. The Mt. Healthy Question

Defendants' main appeal presents an issue of first impression in this circuit re-

---

3. Under Federal Rule of Civil Procedure 50(c)(1), if

> the renewed motion for judgment as a matter of law is granted, the court shall also rule on the motion for a new trial, if any, by determining whether it should be granted if the judgment is thereafter vacated or reversed, and shall specify the grounds for granting or denying the motion for the new trial. If the motion for a new trial is thus conditionally granted, the order thereon does not affect the finality of the judgment.

Here, the district court entered judgment as a matter of law in favor of defendants on plain-

tiffs' equal protection claims, but conditionally granted a new trial, on the ground that it had given the jury an erroneous instruction on equal protection.

4. "Defendants" here refer to those defendants against whom the jury returned verdicts, namely, Demonaco, Anderson, Smith, Schweisinger, Lam, and Mayhew.

5. "Plaintiffs" here refer to those plaintiffs in favor of whom the jury entered verdicts, namely, Herr, Wilson, Bowler, and Raphael.

garding a claim of retaliatory firing in a multi-tiered termination process. It is undisputed that defendants Demonaco, Anderson, and Huntley all participated directly in the process resulting in the disciplinary actions taken against plaintiffs Herr, Wilson, and Bowler (the only plaintiffs who prevailed on their retaliation claims). Those defendants did so, however, to varying degrees and at different stages. Demonaco was the driving force behind the PTF investigation and made the initial decisions to terminate plaintiffs; Anderson conducted plaintiffs' *Skelly* hearings and affirmed Demonaco's recommendations; and Huntley served as the final decision-maker, sustaining Herr's termination, but reducing Wilson's and Bowler's punishments to a suspension and a reduction of pay. When asked to determine each defendant's actual motive for taking adverse action against plaintiffs, the jury returned mixed findings. The jury found that plaintiffs' protected conduct had played a "substantial or motivating" role in Demonaco's and Anderson's actions against plaintiffs, but had not played such a role in the actions of Huntley.

■ Based on those findings, defendants contend that, under the mixed-motive analysis of *Mt. Healthy City School District Board of Education v. Doyle,* 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977), plaintiffs' claims of First Amendment retaliation cannot survive as a matter of law. Defendants argue that, under *Mt. Healthy,* "if the defendant demonstrates the same decision would have been made even in the absence of protected conduct, plaintiff's proof of causation fails, there is no violation of the First Amendment." Defendants reason that, because the jury found that plaintiffs' protected conduct did *not* play a "substantial or motivating" role in Huntley's decision-making, his legitimate, nonretaliatory motive "cuts off" the liability of his subordinates, Demonaco and Anderson, and the co-conspirator defendants, Smith, Schweisinger, Lam, and Mayhew. The district court rejected de-

fendants' argument, a decision that we review *de novo. See Martinez v. City of Los Angeles,* 141 F.3d 1373, 1382 (9th Cir.1998) (applying that standard of review to constitutional issues).

In *Mt. Healthy,* the Supreme Court held that, in an environment where both legitimate and illegitimate motives may have played a part in an adverse employment action, the ultimate inquiry is whether the employer "would have reached the same decision as to [the plaintiff's] [ ]employment even in the absence of the protected conduct." 429 U.S. at 287, 97 S.Ct. 568. In so holding, the Court rejected a rule that "focuse[d] solely on whether [the plaintiff's] protected conduct played a part" in the employer's decision. *Id.* at 285, 97 S.Ct. 568. Such a limited inquiry, the Court reasoned, "could place an employee in a better position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Id.*

> A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer from assessing his performance record and reaching a decision not to rehire on the basis of that record, simply because the protected conduct makes the employer more certain of the correctness of its decision.

*Id.* at 286, 97 S.Ct. 568. The First Amendment, the Court stated, "is sufficiently vindicated if such an employee is placed in no worse a position than if he had not engaged in the conduct." *Id.* at 285–86, 97 S.Ct. 568.

■ The Court then formulated a two-part burden-shifting inquiry for cases involving mixed motives for discharge. First, the plaintiff must show that his or her conduct was constitutionally protected and that the conduct was a "substantial" or "motivating" factor in the defendant's employment decision. *Id.* at 287, 97 S.Ct.

568. If the plaintiff makes those showings, then the burden shifts to the defendant to show "by a preponderance of the evidence that it would have reached the same decision ... even in the absence of the [plaintiff's] protected conduct." *Id.*

This case does not fit neatly into the *Mt. Healthy* framework, because—according to the jury's findings—the disciplinary process here *began* with a retaliatory motive, but *ended* with a legitimate one. That is, although the ultimate decision-maker, Huntley, had a legitimate motive to impose discipline, the retaliatory motives of two subordinates, Demonaco and Anderson, set in motion the chain of events that led to Huntley's review and to the adverse employment action.

In *Johnson v. Duffy*, 588 F.2d 740 (9th Cir.1978), this court explained the nature of liability under § 1983.[6] This court held that "personal participation is not the only predicate for section 1983 liability. Anyone who 'causes' any citizen to be subjected to a constitutional deprivation is also liable." *Id.* at 743. This court further explained that the "requisite causal connection can be established not only by some kind of direct personal participation in the deprivation, but also by setting in motion a series of acts by others which the actor knows or reasonably should know would cause others to inflict the constitutional injury." *Id.* at 743–44.

Although this court has not addressed the issue of liability in the precise circumstances of this case, our sister circuits have done so in a manner consistent with the law of this circuit, as articulated in *Johnson v. Duffy*. They have held that, when a superior makes a nonretaliatory decision to uphold a discharge, such a decision does not automatically immunize a subordinate against liability for her retaliatory acts, which led ultimately to the

dismissal. In *Professional Ass'n of College Educators v. El Paso County Community College District*, 730 F.2d 258 (5th Cir.1984), the defendants were the El Paso County Community College District (College), the College's Board of Trustees, and the College's president. The College's president had recommended that the plaintiff be dismissed, a recommendation that the Board of Trustees affirmed. Although the jury found that the president had acted with a retaliatory intent, the defendants argued that they could not be held liable for a retaliatory discharge, because the jury also had found that the Board of Trustees, the final decision-maker, was not so motivated. In other words, the defendants claimed that the Board of Trustees' legitimate decision inoculated them against liability. The Fifth Circuit rejected the defendants' argument. The court reasoned:

> The causation issue in first amendment cases is purely factual: did retaliation for protected activity cause the termination in the sense that the termination would not have occurred in its absence? It is not necessary that the improper motive be the final link in the chain of causation: *if an improper motive sets in motion the events that lead to termination that would not otherwise occur, "intermediate step[s] in the chain of causation" do not necessarily defeat the plaintiff's claim.*

*Id.* at 266 (citation omitted) (emphasis added). The court concluded that, even though a final decision-maker may stand between the wrongfully motivated subordinate and the plaintiff, the element of causation is satisfied if the final decision-maker "would not have considered dismissing [the plaintiff] if [the wrongfully motivated subordinate] had not brought charges in reprisal for protected activity" in the first place. *Id.* Other circuits have

---

**6.** Section 1983 provides in part that "[e]very person who, under color of any statute of any state ..., subjects, or *causes to be subjected,* any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured." 42 U.S.C. § 1983 (emphasis added).

taken a similar approach. *See Saye v. St. Vrain Valley Sch. Dist.*, 785 F.2d 862, 867–68 (10th Cir.1986) (holding that liability for a retaliatory discharge is not cut off, when a school board decides to dismiss a teacher based on the recommendation of a school principal who had retaliatory intent); *Hickman v. Valley Local Sch. Dist. Bd. of Educ.*, 619 F.2d 606, 610 (6th Cir.1980) (holding that, when a line of causation exists, "and the principal or superintendent predicated their recommendations on constitutionally impermissible reasons, these reasons become the basis of the decision by the Board members").

We are persuaded by the reasoning of those authorities. The focus of the *Mt. Healthy* mixed-motive analysis is not whether the defendant has produced some legitimate basis for the disciplinary action, but rather whether the disciplinary action would have been taken against the plaintiff "even in the absence of the protected conduct." *Mt. Healthy*, 429 U.S. at 287, 97 S.Ct. 568. Thus, in the same way that an employee cannot use protected conduct as a shield against a dismissal that would have occurred even in the absence of the protected conduct, a subordinate cannot use the nonretaliatory motive of a superior as a shield against liability if that superior never would have considered a dismissal but for the subordinate's retaliatory conduct. That principle applies equally to those defendants found to have conspired with Demonaco and Anderson. They cannot escape co-conspirator liability merely because the jury found that the last person with review authority in the disciplinary process had a legitimate motive. To hold otherwise would place an employee in a *worse* "position as a result of the exercise of constitutionally protected conduct than he would have occupied had he done nothing." *Id.* at 285, 97 S.Ct. 568.

In support of their position, defendants rely on authorities addressing the element of causation in Title VII discrimination actions, as it relates to the question of vicarious liability. For example, defendants cite *Willis v. Marion County Auditor's Office*, 118 F.3d 542, 547 (7th Cir. 1997), for the proposition that, "when the causal relationship between the subordinate's illicit motive and the employer's ultimate decision is broken, and the ultimate decision is clearly made on an independent and legally permissive basis, the bias of the subordinate is not relevant." *See also DeHorney v. Bank of Am. Nat'l Trust & Savs. Ass'n*, 879 F.2d 459, 467 (9th Cir.1989) (holding that the plaintiff had failed to make out a *prima facie* case of race discrimination, when there was no evidence to establish a nexus between the subordinate's racial slur and the superior's decision to terminate); *Long v. Eastfield College*, 88 F.3d 300, 307 (5th Cir.1996) (holding that, if the final decision-maker "based his decisions on his own independent investigation, the causal link between" the subordinates' retaliatory intent and the plaintiffs' terminations would be broken).

We do not disagree with the principles articulated in those authorities. Rather, those authorities emphasize, as we do here, that the *Mt. Healthy* mixed-motive inquiry is an intensely factual one, the results of which will vary depending on the circumstances. We do not hold that a final decision-maker who lacks any improper motive *never* can absolve a subordinate of liability for his or her retaliatory acts, any more than we hold that such a decision-maker *always* can absolve the subordinate. Indeed, we express no opinion as to what the result should be, as a matter of law, if the facts showed that the final decision-maker made a wholly independent, legitimate decision to discharge the plaintiff, uninfluenced by the retaliatory motives of a subordinate. *See Professional Ass'n*, 730 F.2d at 266 n. 14 (declining to reach that same question).

Those are not the facts before us, however. Even though Huntley was the final decision-making authority in a multi-tiered termination process, by the logic of its verdict, the jury must have concluded that

Huntley would not have disciplined Herr, Wilson, or Bowler if Demonaco and Anderson had not brought charges against those plaintiffs in the first place. *Cf. id.* (holding the same under similar facts). As discussed, it was not improper as a matter of law for the jury to reach such a conclusion.[7]

### B. *Sufficiency of the Evidence* [8]

We move next to defendants' contention that there was insufficient evidence to support the jury's verdicts on the claims of retaliation. Defendants maintain that the district court should have entered judgment as a matter of law in their favor on those claims or, alternatively, should have granted a new trial because the jury's verdicts were against the clear weight of the evidence. *See Rattray v. City of Nat'l City*, 51 F.3d 793, 800 (9th Cir.1994) (holding that the district court has discretion to grant a new trial when the jury's verdict is contrary to the "clear weight of the evidence" or is based on false evidence, or when a new trial is needed to prevent a "miscarriage of justice") (citation and internal quotation marks omitted). We are not persuaded by either argument.

The standard of review for the denial of a motion for judgment as a matter of law after a jury trial is the same as the standard of review for reviewing a jury's verdict: "both the verdict and the denial of the motion must be affirmed if there is substantial evidence to support the verdict." *Landes Constr. Co. v. Royal Bank of Canada*, 833 F.2d 1365, 1370–71 (9th Cir.1987). "Substantial evidence is such relevant evidence as reasonable minds might accept as adequate to support

a conclusion even if it is possible to draw two inconsistent conclusions from the evidence." *Id.* at 1371. We may not assess the credibility of witnesses in determining whether substantial evidence exists to support the jury's verdict. *See id.* Additionally, we review for abuse of discretion the district court's denial of a motion for a new trial grounded on the assertion that the jury's verdict was against the clear weight of evidence. *See id.* at 1372 (stating standard of review).

In addition to finding that defendants Demonaco and Anderson had retaliated directly against plaintiffs Herr and Wilson, the jury found that defendants Demonaco, Anderson, Smith, Schweisinger, Lam, and Mayhew had conspired to retaliate against Herr and Wilson. "A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Vieux v. East Bay Reg'l Park Dist.*, 906 F.2d 1330, 1343 (9th Cir.1990) (citation and internal quotation marks omitted). To prove a civil conspiracy, the plaintiff must show that the conspiring parties "reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement." *Id.* (citation and internal quotation marks omitted). "To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1541 (9th Cir.1989) (en banc). A defendant's knowledge of and participation in a conspiracy may be inferred from circumstan-

---

7. The jury's exoneration of Huntley has no effect on municipal liability, because the City was not held liable based on Huntley's ratification of the disciplinary action against plaintiffs. Rather, municipal liability was imposed because City officials with final decision-making authority in personnel matters, Mayor Smith and City Council members Schweising-

er and Lam, directly participated in the conspiracy to retaliate against plaintiffs.

8. For the reasons stated at pages 878–79, below, we conclude that there was insufficient evidence to support the jury's verdict in favor of Bowler. We, therefore, do not consider Bowler to be a "plaintiff" for purposes of this section.

tial evidence and from evidence of the defendant's actions. *See United States v. Calabrese*, 825 F.2d 1342, 1348 (9th Cir. 1987) (involving a criminal conspiracy).

■ On this record, we are satisfied that there was substantial evidence from which the jury could infer that defendants had retaliated and had conspired to retaliate against Herr and Wilson. To varying degrees, each defendant participated in the events surrounding the adverse employment actions taken against plaintiffs. From that participation, the jury could have inferred that defendants reached a "unity of purpose or a common design" to retaliate against plaintiffs for exercising their constitutionally protected rights.

Demonaco played the most direct and active role in the disciplinary process. For example, he spearheaded the PTF investigation and kept other defendants informed about his findings by way of closed-door City Council meetings. He also prepared and issued the notices of discharge accusing plaintiffs of fraud and/or embezzlement, when such charges had not been substantiated by the Orange County District Attorney's Office. Demonaco later confessed to Gilbrook that he thought that Gilbrook had done nothing wrong.

Defendants maintain that such evidence can give rise to only one reasonable inference: that Demonaco was discharging his proper duties as Fire Chief, not retaliating against plaintiffs. We cannot agree. "Acts which seem otherwise innocent, when viewed in the context of the surrounding circumstances, may justify an inference of complicity." *United States v. Batimana*, 623 F.2d 1366, 1368 (9th Cir. 1980). That principle applies squarely in this case, where the caustic political environment surrounding plaintiffs' discharges may have caused the jury to infer that an ulterior motive lay at the heart of Demonaco's actions.[9]

■ The same can be said about Anderson. Like Demonaco, Anderson was involved directly in the disciplinary process. He served as plaintiffs' *Skelly* hearings officer and, in each instance, affirmed Demonaco's recommendation of discharge. Moreover, despite knowing that he would be sitting in judgment of plaintiffs, Anderson attended the closed-door City Council meetings, during which Demonaco discussed the PTF investigation and recommended what actions should be taken against the firefighters. Then, after the *Skelly* hearings, Anderson met with Demonaco to discuss the notices of termination. From the foregoing evidence, the jury could have concluded that Anderson was a biased hearings officer, who rubber-stamped Demonaco's findings and recommendations. Such an inference is enough to tie Anderson to the conspiracy. *Cf. United Steelworkers*, 865 F.2d at 1541 ("Evidence that police failed to exercise independent judgment will support an inference of conspiracy with a private party.").

■ The participation of the City's elected officials (Smith, Schweisinger, and Lam) is more attenuated than that of Demonaco and Anderson, but there is sufficient evidence in the record to connect those defendants to a retaliatory scheme or plan. Each of those defendants was present during the closed-door City Council meetings, during which Demonaco discussed what disciplinary actions should be taken against plaintiffs. Additionally, Smith, Schweisinger, and Lam each made several hostile statements about the City's firefighters, including threats of political retribution and accusations of criminal conduct, from which the jury could have inferred that those defendants shared a unity of purpose with Demonaco and Anderson.[10]

**9.** We do not suggest that the mere fact that a city official terminates an employee in an atmosphere of political controversy is sufficient to support a finding that the official acted with retaliatory intent. Here, Plaintiffs presented specific evidence that Demonaco's stated reasons for the termination were pretextual.

**10.** Defendants rely on *Nunez v. City of Los Angeles*, 147 F.3d 867 (9th Cir.1998), for the proposition that words alone cannot form the basis of a claim of retaliation. Although that

■ Finally, Mayhew, too, made disparaging comments about the firefighters and played an active role in the investigation and termination of plaintiffs. Mayhew was the City's point person with Peat Marwick, attended meetings with the Orange County District Attorney's Office, and worked closely with the FRC. He routinely referred to the firefighters as "crooks" and "thieves," often in the presence of City Council members. Huntley, Mayhew's superior, even warned Mayhew that he needed to refrain from making such remarks to City Council members, because they (Huntley and Mayhew) did not know whether the firefighters had committed a crime and their job was only to present facts to the City Council. Such evidence was sufficient to connect Mayhew to the conspiracy.

In summary, there was substantial evidence to support the jury's verdicts in favor of plaintiffs Herr and Wilson on their claims of retaliation. The district court properly denied defendants' motions.

## C. *Additional Grounds for a New Trial*

We turn now to the multitude of additional alleged errors that defendants claim were highly prejudicial and warrant a new trial. We are persuaded by none of defendants' arguments.

### 1. *Evidentiary Errors*

■ Defendants challenge several of the district court's evidentiary decisions. We review those rulings for abuse of discretion. *See EEOC v. Pape Lift, Inc.*, 115 F.3d 676, 680 (9th Cir.1997) (stating that standard of review). "To order a reversal on the basis of an erroneous evidentiary ruling, we must find not only that the district court abused its discretion but also that the error was prejudicial. Reversal of

a jury verdict is not warranted unless the evidentiary error affects a party's substantial rights." *Heyne v. Caruso*, 69 F.3d 1475, 1478 (9th Cir.1995) (citation omitted).

■ Defendants first contend that the district court erred by admitting those portions of the FRC's report recommending that fire services be privatized and that the City's fire department be excluded from any future contractual bidding process unless the firefighters curtailed their political activities. Defendants maintain that such evidence was inadmissible, on the grounds that it was hearsay, irrelevant, and prejudicial. We disagree.

■ With respect to the hearsay objection, the district court properly admitted all portions of the FRC's report under the public records exception to the rule against hearsay. *See* Fed.R.Evid. 803(8). A trial court may presume that public records are authentic and trustworthy. *See Johnson v. City of Pleasanton*, 982 F.2d 350, 352 (9th Cir.1992). The burden of establishing otherwise falls on the opponent of the evidence, who must come "forward with enough negative factors to persuade a court that a report should not be admitted." *Id.* Here, defendants produced no evidence whatsoever to raise doubts about the reliability of the FRC's report, in whole or in part. Defendants have not contested the factual foundation of the report, nor have they suggested that the FRC failed to perform "their duties properly without motive or interest other than to submit accurate and fair reports." *Id.* at 352–53 (citation and internal quotation marks omitted). Moreover, the fact that the challenged portion of the FRC's report contains a recommendation or opinion does not remove it from the purview of Federal Rule of Evidence 803(8). *See Beech Aircraft Corp. v. Rai-*

is a correct statement of the law, that principle is inapplicable here. In *Nunez*, this court rejected the plaintiff's claim of retaliation, because the defendants' "bad-mouth[ing]" and verbal threats had not resulted in any adverse employment action. *Id.* at 875. The absence of any cognizable injury prompted this court to

observe that "[i]t would be the height of irony, indeed, if mere speech, in response to speech, could constitute a First Amendment violation." *Id.* Here, of course, defendants subjected plaintiffs to more than just "bad-mouthing" and verbal threats: Herr lost his job, and Wilson lost a substantial amount of pay.

# 859

*ney,* 488 U.S. 153, 162, 109 S.Ct. 439, 102 L.Ed.2d 445 (1988) ("[F]actually based conclusions or opinions ... are not on that account excluded from the scope of Rule 803(8)(C).").

■ With respect to the remaining objections, the district court properly admitted the challenged portions of the FRC's report, because they were relevant to establishing the circumstances in which the alleged retaliation occurred and were probative of defendants' actual motives for their actions. As the district court held, the evidence was "probative on the issue of defendants' intent as to whether the defendants adopted any of the recommendations, and whether or not the recommendations originated with citizens." Any prejudice that defendants may have suffered did not substantially outweigh the probative value of that evidence. *See* Fed.R.Evid. 403.

■ Next, defendants complain that the district court erred by permitting Gilbrook to testify that Demonaco had told him, after his dismissal, that he (Gilbrook) "had done nothing wrong" and that "the whole mess ... was the cause of Brian Mayhew." Defendants argue on appeal that Gilbrook's testimony was inadmissible because Demonaco had made those statements during the course of settlement discussions in which Demonaco offered to reinstate Gilbrook. *See* Fed.R.Evid. 408 ("Evidence of conduct or statements made in compromise negotiations is ... not admissible" to prove liability.). *At trial,* however, when plaintiffs first offered Gilbrook's testimony, defendants objected to its admission only on the grounds that it was irrelevant and hearsay. By failing to make a timely and specific objection on the basis of Rule 408, *see* Fed.R.Evid. 103(a)(1),[11] defendants waived their right to contest the admission of Gilbrook's testimony on that ground. *See ESCO Corp.*

*v. United States,* 750 F.2d 1466, 1469–70 (9th Cir.1985) (applying the rule of waiver in analogous circumstances).

■ Defendants also challenge the admission of certain hearsay statements made by Smith ("I'll have your ass") and Schweisinger (statements regarding political retribution), on the ground that the district court erroneously admitted those statements under the co-conspirator exception, *see* Fed.R.Evid. 801(d)(2)(E). We decline to reach the merits of that argument, because the district court properly admitted those statements under the exception for admissions by a party-opponent, *see* Fed.R.Evid. 801(d)(2)(A). *See Charley's Taxi Radio Dispatch Corp. v. SIDA of Hawaii, Inc.,* 810 F.2d 869, 874 (9th Cir. 1987) ("We may affirm the district court on any ground supported by the record.").

■ As their final assignment of evidentiary error, defendants object to the admission of evidence relating to plaintiffs' emotional distress predating the disciplinary actions taken against them. Defendants assert that such evidence should have been excluded, because it was irrelevant to establishing the injury proximately caused by the disciplinary actions. We disagree. As plaintiffs correctly argue, the jury not only found that Anderson and Demonaco were liable individually for retaliating against plaintiffs, but also found that Anderson, Demonaco, and four other defendants had conspired to retaliate against plaintiffs because of their protected activities. Thus, whatever damages plaintiffs suffered as a proximate result of the conspiracy were recoverable. *See Sanchez v. City of Santa Ana,* 936 F.2d 1027, 1039 (9th Cir.1990) ("To be actionable, the conspiracy must result in overt acts, done in furtherance of the conspiracy, that are both the cause in fact and proximate cause of plaintiffs' injuries.").

**11.** Federal Rule of Evidence 103(a)(1) provides that error may not be predicated upon the admission of evidence, unless "a timely objection or motion to strike appears of rec-

ord, stating the specific ground of objection, if the specific ground was not apparent from the context."

Here, there was substantial evidence from which the jury could conclude that the conspiracy consisted of overt acts that occurred before plaintiffs' terminations. For example, the jury could have concluded, as it apparently did, that the PTF investigation was part of a larger scheme to exact retribution for the firefighters' 1992 election activities and their later recall effort. Evidence of emotional distress proximately caused by those pre-discharge actions was relevant to establishing plaintiffs' injuries and, therefore, was properly admitted.

### 2. *Jury Instructions*

■■■■ Next, we consider defendants' argument that a new trial is warranted, because the district court read to the jury two prejudicial instructions. "Jury instructions must be formulated so that they fairly and adequately cover the issues presented, correctly state the law, and are not misleading." *Chuman v. Wright,* 76 F.3d 292, 294 (9th Cir.1996). Because the district court has substantial latitude in tailoring jury instructions, we review the formulation of those instructions for abuse of discretion. *See Kendall–Jackson Winery, Ltd. v. E. & J. Gallo Winery,* 150 F.3d 1042, 1046 (9th Cir.1998) (stating that standard of review). However, "[i]f the instructions are challenged as a misstatement of the law, they are then reviewed *de novo.*" *Mockler v. Multnomah County,* 140 F.3d 808, 812 (9th Cir.1998) (citation and internal quotation marks omitted).

■■■ Defendants first contend that the jury instruction on conspiracy was erroneous. That instruction, which plaintiffs adopted from a form instruction on conspiracy, *see* Edward J. Devitt *et al.,* 3 *Federal Jury Practice and Instruction* § 103.23 (4th ed.1987) (setting forth the standard conspiracy instruction), provided in pertinent part:

> In order to establish that a conspiracy existed, the plaintiffs must show that members of the conspiracy in some way or manner, or through some contrivance, positively or tacitly came to a mutual understanding to try to accomplish a common and unlawful plan.

Defendants assert that the foregoing instruction "offers no meaningful standard to guide the jury's decision as to what conduct may serve to connect a defendant to a conspiracy." Although defendants concede that the instruction "represents a summation of decisional law," they argue that its wording—"in some way or manner, or through some contrivance, positively or tacitly"—is so vague as to render that instruction meaningless. Fairly read, defendants' argument is an attack on the wording of the instruction, not on its statement of the substantive law. That being so, we review the instruction for abuse of discretion. *See Kendall–Jackson,* 150 F.3d at 1046 (stating that standard of review).

When read as a whole, the jury instruction is not so open-ended as to permit jurors to infer, as defendants fear, a conspiracy "from the mere fact that two defendants shared a dislike of the plaintiff." The instruction cautioned that the "[m]ere similarity of conduct among various persons and the fact that they may have associated with each other and may have assembled together and may have discussed some common aims and interests, is not necessarily proof of the existence of a conspiracy." We have recognized, in the criminal context, that such cautionary wording is adequate to protect against the possibility that jurors might infer a conspiratorial relationship merely from close association. *See United States v. Kenny,* 645 F.2d 1323, 1337 (9th Cir.1981) (so holding); *see also United Steelworkers,* 865 F.2d at 1549 (Trott, J., dissenting) (noting that the form jury instruction is "carefully distilled from controlling case law"). The same wording is equally effective in the civil context. Accordingly, we conclude that the district court's decision to use the standard jury instruction on conspiracy did not constitute an abuse of discretion.

Next, as a challenge to the district court's jury instruction on compensatory damages, defendants repackage their argument relating to the admission of certain evidence of emotional distress. They maintain that it "was prejudicial error to instruct the jury that plaintiffs were entitled to damages for 'all the injuries ... they suffered.'" Defendants' argument lacks merit.

First, defendants misstate the district court's jury instruction on compensatory damages. That instruction nowhere stated that plaintiffs should be compensated for "all the injuries ... they suffered." Rather, the instruction on damages specified that compensatory damages could be awarded "only for injuries that the plaintiff proves were proximately caused by defendant's deprivation of plaintiffs['] constitutional rights." Moreover, the instruction defined the types of economic and noneconomic losses for which plaintiffs could be compensated (e.g., back pay, employee benefits, pain, and suffering) and cautioned that "damages ... must be fair compensation" and must not be premised on "sympathy, speculation, or guess work." Reading the instruction as a whole, we conclude that the district court did not abuse its discretion.

For the reasons discussed in the preceding three sections, we affirm the judgments in favor of plaintiffs Herr and Wilson against Demonaco, Anderson, and the co-conspirator defendants, Smith, Schweisinger, Lam, and Mayhew.

## D. *Gilbrook's Claim of Slander Per Se*

▉ Up next for review is Gilbrook's state-law claim of slander per se against defendant Schweisinger. By special verdict, the jury concluded that Schweisinger had defamed Gilbrook by calling him a "Jimmy Hoffa." Following trial, Schweisinger moved for judgment as a matter of law under Rule 50(b), on the grounds that (1) the "Jimmy Hoffa" statement constituted constitutionally protected "figurative or hyperbolic language" that could not be an "objectively verifiable event," *see Milkovich v. Lorain Journal Co.,* 497 U.S. 1, 20, 110 S.Ct. 2695, 111 L.Ed.2d 1 (1990) (stating principles), and (2) there was insufficient proof of either publication or actual malice. The district court rejected Schweisinger's first argument, concluding that "Jimmy Hoffa is universally known as an unscrupulous union leader, [whose] reputation is drenched in his ties to the criminal underworld.... The implication [of Schweisinger's statement] was clear: Gilbrook was a thief." The district court also ruled that there was substantial evidence to support the jury's verdict. Schweisinger challenges both of those rulings, each of which we are to review *de novo. See Gerritsen v. City of Los Angeles,* 994 F.2d 570, 575 (9th Cir.1993) (stating that standard of review for questions involving the First Amendment); *Lawson v. Umatilla County,* 139 F.3d 690, 692 (9th Cir.1998) (applying that standard of review to decisions denying or granting judgment as a matter of law). We need to reach only the first issue, because we conclude that the district court erred.

▉ The First Amendment places limits on the types of speech that may give rise to a defamation action under state law. *See Milkovich,* 497 U.S. at 14–21, 110 S.Ct. 2695 (citing cases). Such protection extends to statements of opinion, addressing matters of public concern, that do not "contain a provably false factual connotation," *id.* at 20, 110 S.Ct. 2695, and to statements that cannot "reasonably [be] interpreted as stating actual facts," *id.* (citation and internal quotation marks omitted); *see also Underwager v. Channel 9 Australia,* 69 F.3d 361, 366 (9th Cir.1995) ("The scope of constitutional protection extends to statements of opinion on matters of public concern that do not contain or imply a provable factual assertion."). Thus, a court reviewing a claim of defamation must ask a threshold question: Could a reasonable factfinder conclude that the contested statement implies an assertion of

objective fact?[12] *See Partington v. Bugliosi,* 56 F.3d 1147, 1153 (9th Cir.1995) (setting forth that threshold inquiry).

To make that determination, this court has adopted a three-part test, in which we must examine the totality of the circumstances in which the defendant made the challenged statement.

> First, we look at the statement in its broad context, which includes the general tenor of the entire work, the subject of the statements, the setting, and the format of the work. Next we turn to the specific context and content of the statements, analyzing the extent of figurative or hyperbolic language used and the reasonable expectations of the audience in that particular situation. Finally, we inquire whether the statement itself is sufficiently factual to be susceptible of being proved true or false.

*Underwager,* 69 F.3d at 366.

Applying the *Underwager* analysis here, we conclude that Schweisinger's "Jimmy Hoffa" statement was protected by the First Amendment and, therefore, was not the type of speech that may be the subject of a state-law defamation action. First, the broad context in which Schweisinger made his statement negates the impression that he intended to assert that Gilbrook was guilty of actual criminal conduct. Schweisinger made the statement in the summer of 1993, during the contentious public debate about whether to adopt the FRC's recommendation to cut the fire department's budget. At that time, the PTF scandal had not yet surfaced, nor had Peat Marwick released its initial report detailing the fire department's inflated overtime expenses. The second Peat Marwick report, which specified the number of PTF violations of each firefighter, including Gilbrook, came months later. Thus, the political environment, although acrimonious, was not yet saturated with public accusations of criminal wrongdoing, as it would be six months later. This general context makes clear that Schweisinger's statement conveyed little more than his opinion about a union official, who was a political opponent in a tense political climate. *Cf. id.* at 366–67 (observing that the general context involved a controversial subject about which the plaintiff and the defendant were on opposite sides).

Second, Schweisinger's use of the name of a notorious union leader to characterize Gilbrook, who also was a union leader, constitutes the type of "colorful, figurative rhetoric that reasonable minds would not take to be factual." *Id.* at 367. During the course of a public debate or a labor dispute, a reasonable audience would anticipate epithets, fiery rhetoric, or hyperbole. *See Leidholdt v. L.F.P, Inc.,* 860 F.2d 890, 893–94 (9th Cir.1988) (providing, by way of example, that public debates and labor disputes are instances in which a reasonable audience would expect rhetorical speech); *see also Old Dominion Branch No. 496, Nat'l Ass'n of Letter Carriers v. Austin,* 418 U.S. 264, 286, 94 S.Ct. 2770, 41 L.Ed.2d 745 (1974) (observing that labor disputes often involve exaggerated rhetoric); *New York Times Co. v. Sullivan,* 376 U.S. 254, 270, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964) (observing that protected speech may include "vehement, caustic, and sometimes unpleasantly sharp attacks"). "Such language remains well within the realm of lusty and imaginative expressions protected by the Constitution." *Underwager,* 69 F.3d at 367. That certainly is true in this case, where the FRC's report launched a public debate about whether the fire department's budget should be cut and whether the union's political activity should be curtailed. Viewed in that specific context, Schweisinger's reference to "Jimmy Hoffa" was a loose, figurative expression of his strong disagreement with

---

**12.** The district court posed this question to the jury. Each special verdict form addressing the claim of slander per se asked: "Was this statement an opinion which did not convey a provably false assertion of fact?" The parties have not asserted on appeal that this procedure was erroneous, so we need not consider whether it was.

the union's activities and his support for the proposed budget cuts. *Cf. Letter Carriers,* 418 U.S. at 282–86, 94 S.Ct. 2770 (holding that the defendant's use of the word "scab" as a descriptor of nonunion members was not actionable in the context of a labor dispute).

Finally, we conclude that the "Jimmy Hoffa" statement was not sufficiently susceptible of being proved true or false, because it did not "rest on a 'core of objective evidence.'" *Underwager,* 69 F.3d at 367. Unlike the district court, we believe that not all reasonable people associate the name and persona of Jimmy Hoffa with *criminal* activity. As defendants point out, many modern-day teamsters still consider Jimmy Hoffa to be a hero who brought strength to the truckers' union and improved the welfare of truckers nationwide. *See* Jeffrey Goldberg, *Jimmy Hoffa's Revenge,* The New York Times Magazine, Feb. 8, 1998, at 42 (observing that Jimmy Hoffa is "still a hero to many modern-day teamsters"). Others might simply view Jimmy Hoffa as someone who, although not worthy of praise, was a powerful, formidable labor leader. *See id.* at 67 ("To think of Jimmy Hoffa only as a gangster who robbed his union's pension funds is to forget that he is also responsible for one of the great contracts in labor history."). Even those who respond negatively to the name "Jimmy Hoffa" may be thinking of unprovable adjectives such as "crude," "aggressive," or "demagogical," or

of his fate, rather than of a fact-based trait such as "dishonesty."

In the final analysis, Schweisinger's reference to Jimmy Hoffa was the type of rhetorical hyperbole or caustic attack that a reasonable person would expect to hear in a rancorous public debate involving money, unions, and politics. Therefore, the statement could not give rise to a cognizable claim of defamation. Accordingly, we vacate the jury's verdict in favor of Gilbrook and instruct the district court to enter judgment as a matter of law in favor of Schweisinger on Gilbrook's claim of slander pe se.

### E. *The New Trial as to Bowler*

■ Defendants' final argument on appeal concerns the district court's order granting plaintiff Bowler a new trial on his retaliation claims. At the close of trial, defendants filed a Rule 50(b) motion as to Bowler's civil rights claims, on the ground that Bowler had produced no evidence showing that he had engaged in any activities protected by the First Amendment. The district court agreed with defendants' argument but, instead of entering judgment as a matter of law in favor of defendants, the district court ordered a new trial on the ground that defendants had failed to make a timely sufficiency-of-the-evidence argument as to Bowler in their Rule 50(a) motion.[13] *See Image Technical Servs., Inc. v. Eastman Kodak Co.,* 125 F.3d 1195, 1212 (9th Cir.1997) ("We strict-

---

13. The district court decided to treat defendants' Rule 50(b) motion regarding Bowler as a motion for new trial, based on *Posadas de Mexico, S.A. de C.V. v. Dukes,* 789 F.Supp. 121 (S.D.N.Y.1992). In that case, the court held that, "if the party moving for judgment [notwithstanding the verdict] has not moved for a directed verdict, and if the court is nevertheless satisfied that justice requires that the judgment be vacated for insufficiency of the evidence, the court should normally grant a new trial." *Id.* at 124 (citation and internal quotation marks omitted). The *Posadas* court noted that such a conversion was consistent with the Second Circuit's precedent, which permits a reviewing court to order a new trial, notwithstanding an appellant's failure to

move for a directed verdict, when a jury's verdict is wholly without support. *Id.; see also Metromedia Co. v. Fugazy,* 983 F.2d 350, 362 (2d Cir.1992) (stating that rule).

The parties have not asked us to consider whether the district court's conversion of the motion was consistent with Ninth Circuit precedent. Because we reverse the district court's decision on other grounds, we need not reach this issue. *But see Patel v. Penman,* 103 F.3d 868, 878–79 (9th Cir.1996) (reviewing for plain error when the appellant failed to file a motion for directed verdict in the trial court and reversing the judgment when there was no evidence to support the jury's verdict), *cert. denied,* 520 U.S. 1240, 117 S.Ct. 1845, 137 L.Ed.2d 1048 (1997).

ly adhere to the requirements of Rule 50(b), which prohibit a party from moving for a judgment as a matter of law after the jury's verdict unless that motion was first presented at the close of evidence.").

■ On appeal, defendants contend that the district court erred, because they did not procedurally default their sufficiency-of-the evidence argument. We review the district court's decision for abuse of discretion. *See Muckleshoot Tribe v. Lummi Indian Tribe*, 141 F.3d 1355, 1358 (9th Cir.1998) ("We review a decision regarding the management of litigation for abuse of discretion.").

Our review of defendants' Rule 50(a) motion supports their claim of no procedural default. First, defendants titled their Rule 50(a) motion "Memorandum of Points and Authorities in Support of Motion for Judgment as a Matter of Law By Individual Defendants Against Plaintiffs Gilbrook, Garrison, Herr, Raphael, *Bowler*, and Wilson." (Emphasis added.) Second, footnote 6 of that pleading argues clearly for a directed verdict against Bowler on the ground of lack of evidence: "As a threshold matter, Bowler produced no evidence he had done anything to trigger retaliation, for example, no evidence he had participated in any political activities or was a union officer." Finally, the body of the pleading states: "However, all of the evidence plaintiffs adduced merely suggests they were politically active firefighters (*except for Bowler*) who were disciplined, not that they were disciplined because they were politically active." (Emphasis added.) In the foregoing passages, defendants specifically and distinctly raised and argued in their Rule 50(a) motion that there was insufficient evidence to support Bowler's civil rights claims. We hold, therefore, that the district court erred by treating defendants' Rule 50(b) motion as to Bowler as a motion for new trial.

■ Having determined that defendants properly preserved their sufficiency-of-the-evidence argument regarding Bowler, we consider now (rather than later in our discussion of the cross-appeal) Bowler's claim that the district court erroneously concluded that there was insufficient evidence to establish that he had engaged in any protected activity. We review *de novo* the district court's decision that there was insufficient evidence to support the jury's verdicts as to Bowler. *See Lawson*, 139 F.3d at 692 (applying that standard of review to decisions denying or granting judgment as a matter of law). "Judgment as a matter of law is appropriate when the evidence, construed in the light most favorable to the nonmoving party, permits only one reasonable conclusion, which is contrary to the jury's verdict." *Omega Envtl., Inc. v. Gilbarco, Inc.*, 127 F.3d 1157, 1161 (9th Cir.1997), *cert. denied*, —— U.S. ——, 119 S.Ct. 46, 142 L.Ed.2d 36 (1998).

Bowler offers the following evidence to substantiate his claim that he engaged in protected activity: All firefighters, including Bowler, were union members; most, if not all, members participated in precinct-walking in support of the union's electoral efforts; and more than 600 firefighters attended two rallies in support of the union's recall effort. Bowler points to no other evidence connecting him to any protected First Amendment activities.

We agree with the district court that Bowler failed to meet his burden of establishing that he engaged in protected activities. We find the district court's analysis to be persuasive:

> Even if Bowler was a union member, there is no evidence that every firefighter was active in the union's political affairs, much less that Bowler was. Likewise, evidence that 600 firefighters attended rallies or walked precincts does not establish—more likely than not—that Bowler was among them. As such, the jury's conclusion that Bowler participated in political speech is little more than speculation, and does not have a sufficient evidentiary basis.

For the reasons discussed, we vacate the district court's order granting defendants a new trial as to Bowler and remand with the instruction that the district court enter judgment as a matter of law in favor of defendants.

### F. Conclusion on Defendants' Main Appeal

In summary, in defendants' main appeal, No. 96–56306, (1) we affirm the denial of defendants' Rule 50(b) motion as to Herr's and Wilson's claims of retaliation, (2) we vacate the jury's verdict in favor of Gilbrook on his state-law claim of slander per se and instruct the district court on remand to enter judgment as a matter of law in favor of defendant Schweisinger, and (3) we reverse the grant of a new trial as to Bowler's civil rights claims and instruct the district court on remand to enter judgment as a matter of law in favor of defendants.

### III. CROSS–APPEAL (NO. 96–56375)

#### A. Garrison's Retaliation Claims

 On cross-appeal, we consider first plaintiff Garrison's challenge to the district court's entry of judgment as a matter of law in favor of defendants on his claims of retaliation. The district court held that Garrison's statement to the press in the wake of the fatal Candlewood Fire— "This tragedy is the direct result of the Mayor and [City] Council placing politics above the safety of the people"—was not protected speech and, therefore, could not support a claim of retaliation. The district court characterized that statement as "one that was made after a death, essentially accusing the City Council of having caused the decedent's death." Alternatively, the district court held that, even if the statement qualified as protected speech, individual defendants were "entitled to qualified immunity ... because ... [in] the context in which it was made, any reasonable public official would not know whether or not the statement [was] protected." We review both grounds of the district

court's ruling *de novo. See Tucker v. California Dep't of Educ.*, 97 F.3d 1204, 1209 n. 2 (9th Cir.1996) (so stating as to protected speech); *Ace Beverage Co. v. Lockheed Info. Mgmt. Servs.*, 144 F.3d 1218, 1219 (9th Cir.1998) (so stating as to qualified immunity). Because the district court granted defendants' motion for judgment as a matter of law, we view the facts in the light most favorable to Garrison. *See Omega Envtl.*, 127 F.3d at 1161 (stating principle).

 Our inquiry is controlled by this court's recent decision in *Brewster v. Board of Education*, 149 F.3d 971 (9th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1252, 143 L.Ed.2d 349 (1999). *Brewster* involved a claim of First Amendment retaliation brought by a public-school teacher whose contract had not been renewed. In reviewing the plaintiff's claim, this court first emphasized the breadth of qualified immunity, observing that "qualified immunity provides a protection to government officers that is quite far-reaching." 149 F.3d at 977. "Public officials are 'shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Id.* (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982)). In evaluating the clarity of a right, courts "must look not to constitutional guarantees themselves but to the various doctrinal tests and standards that have been developed to implement and to administer those guarantees." *Id.*

> The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right. This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful; but it is to say that in the light of pre-existing law the unlawfulness must be apparent.

*Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987) (citation omitted); *see also Hyland v. Wonder,* 117 F.3d 405, 411–12 (9th Cir.1997) (rejecting the argument that the district court should have granted qualified immunity because no previous Ninth Circuit case involved a comparable plaintiff; the court stated that the "Supreme Court and our case law do not require that degree of specificity").

In *Brewster,* this court went on to determine whether it was "clearly established" that the plaintiff's speech was deserving of constitutional protection when spoken. The first part of that inquiry involves asking whether the public employee's speech addresses a matter of public concern. *See Brewster,* 149 F.3d at 978. *See generally Connick v. Myers,* 461 U.S. 138, 143–49, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (discussing the public-concern inquiry). That determination must be made based on the "content, form, and context of a given statement, as revealed by the whole record." *Id.* at 147–48, 103 S.Ct. 1684 (footnote omitted). If an employee's expression relates to an issue of "political, social, or other concern to the community," as distinct from a mere personal grievance, it fairly is characterized as addressing a matter of public concern. *Id.* at 146–47, 103 S.Ct. 1684; *see Brewster,* 149 F.3d at 978. An employee's motivation and the audience chosen for the speech also are relevant to the public-concern inquiry. *See Johnson v. Multnomah County,* 48 F.3d 420, 425 (9th Cir.1995) (so stating).

On this record, there can be little doubt that Garrison's statement to the press in the wake of the Candlewood Fire addressed a matter of public concern: the fire department's ability to respond effectively to life-threatening emergencies. *See Burgess v. Pierce County,* 918 F.2d 104, 105–06 (9th Cir.1990) (holding that a fire marshal's comments regarding fire safety regulations touched on a matter of public concern), *abrogated on other grounds by Johnson v. Jones,* 515 U.S. 304, 313–18, 115 S.Ct. 2151, 132 L.Ed.2d 238 (1995); *Gillette v. Delmore,* 886 F.2d 1194, 1197–98 (9th Cir.1989) (holding that a firefighter's statement regarding the manner in which firefighters and police had performed their duties involved a matter of public concern). We cannot agree with the district court's characterization of the statement as merely one "accusing the City Council of having caused the decedent's death." Viewed in context, the statement conveyed far more.

Only six months earlier, the City Council had slashed the fire department's budget by laying off six firefighters and putting one fire truck out of commission. The firefighters had protested those moves when made and continued to do so by petitioning for a recall election. Garrison's statement, issued in the form of a press release, *see Roe v. City & County of San Francisco,* 109 F.3d 578, 585 (9th Cir.1997) (observing that "public employee speech reported by the press almost by definition involves matters of public concern") (citation and internal quotation marks and citation), contributed to the union's protest, adding fuel to an already fiery public debate. The statement embodied Garrison's opinion, and the union's, that the City Council's budget cuts had undermined the fire department's ability to fight fires and to protect the lives of people in the community. As Garrison testified: "I made a statement because we had a death. A death we felt could be prevented.... And there was a position of public safety, and we were trying to bring that out into the community." In our view, an opinion about the preparedness of a vital public-safety institution, such as a fire department, goes to the core of what constitutes speech on matters of public concern.[14]

---

**14.** Defendants argue that Garrison's statement was recklessly false and, for that reason, should not be deemed to address a matter of public concern. Defendants overlook the clear law of this circuit:

[R]ecklessly false statements are not per se unprotected by the First Amendment when they substantially relate to matters of public concern. Instead, the recklessness of the employee and the falseness of the state-

■ That Garrison's speech touched on a matter of public concern does not, however, end our inquiry. As this court noted in *Brewster*, "[t]he 'public concern' prong is a necessary, but not a sufficient, condition of constitutional protection. It merely brings the claim within the 'coverage' of the First Amendment, and thus 'ensures that a court will test the reasons for restriction against first amendment standards.'" 149 F.3d at 979 (citation omitted). The court still must conduct the balancing test articulated by the Supreme Court in *Pickering v. Board of Education*, 391 U.S. 563, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968), to determine whether an employee's speech deserves constitutional protection. *See Brewster*, 149 F.3d at 979. That test entails striking "a balance between the interests of the [employee], as a citizen, in commenting on matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering*, 391 U.S. at 568, 88 S.Ct. 1731. "In conducting this balancing, courts must give government employers 'wide discretion and control over the management of [their] personnel and internal affairs. This includes the prerogative to remove employees whose conduct hinders efficient operation and to do so with dispatch.'" *Brewster*, 149 F.3d at 979 (quoting *Connick*, 461 U.S. at 151, 103 S.Ct. 1684) (citation omitted). Because the *Pickering* balance "requires a fact-sensitive, context-specific balancing of competing interests, the law regarding public-employee free speech claims will rarely, if ever, be sufficiently 'clearly established' to preclude qualified immunity." *Id.* at 980 (citation and internal quotation marks omitted).

The issue before us is a narrow one: Does "the outcome of the *Pickering* balance so clearly favor[ ] [Garrison] that it

would have been patently unreasonable for [defendants] to conclude that the First Amendment did not protect [Garrison's] speech"? *Id.* at 980. If it does, we must reverse; if it does not, we must affirm. On this record, we conclude that the district court erred, and we reverse.

■ We note at the outset that Garrison's interest in speaking out about what he and the union perceived to be a serious deficiency in fire protective services, and the public's interest in receiving such information, weigh heavily in favor of according protection to Garrison's speech. Indeed, firefighters, such as Garrison, are members of the community who are most likely to be informed and have definite opinions about the sufficiency of firefighting services. *See Pickering*, 391 U.S. at 572, 88 S.Ct. 1731 (making a similar observation about teachers); *Kannisto v. City & County of San Francisco*, 541 F.2d 841, 843 (9th Cir.1976) (making a similar observation about police officers). Moreover, the "more tightly the First Amendment embraces the speech," the stronger the showing of workplace disruption must be. *Johnson v. Multnomah County*, 48 F.3d at 426 (citation and internal quotation marks omitted); *see also Connick*, 461 U.S. at 152, 103 S.Ct. 1684 (cautioning that "a stronger showing [of disruption] may be necessary if the employee's speech more substantially involved matters of public concern"). Here, as noted, Garrison's expression lies at the core of speech on matters of public concern. Thus, defendants' showing of disruption, real or potential, must be correspondingly greater.

In balancing the competing interests, this court has considered a host of factors. We have inquired whether the speech (1) impaired discipline or control by superiors; (2) disrupted co-worker relations; (3) eroded a close working relationship premised

ments should be considered in light of the public employer's showing of actual injury to its legitimate interests, as part of the *Pickering* balancing test.

*Johnson v. Multnomah County*, 48 F.3d 420, 424 (9th Cir.1995). We evaluate the recklessness of Garrison's speech in text below.

on personal loyalty and confidentiality; (4) interfered with the speaker's performance of his or her duties; or (5) obstructed routine office operations. *See Fazio v. City & County of San Francisco,* 125 F.3d 1328, 1331 n. 1 (9th Cir.1997) (citing those factors), *cert. denied,* —— U.S. ——, 118 S.Ct. 1517, 140 L.Ed.2d 670 (1998). "[P]ublic employers need not allege that an employee's expression actually disrupted the workplace; 'reasonable predictions of disruption' are sufficient." *Brewster,* 149 F.3d at 979 (quoting *Waters v. Churchill,* 511 U.S. 661, 673, 114 S.Ct. 1878, 128 L.Ed.2d 686 (1994) (plurality opinion)). Moreover, this court has weighed (6) whether the speaker directed the statement to the public or the media, as opposed to a governmental colleague, *id.* at 981; (7) whether the speaker served in a high-level, policy-making capacity; and (8) whether the statement was false or made with reckless disregard of the truth, *see Moran v. Washington,* 147 F.3d 839, 849–50 (9th Cir.1998) (considering those last two factors). Because the *Pickering* balance necessarily involves a fact-sensitive inquiry involving the totality of the circumstances, no single factor is dispositive.

Most of the foregoing factors weigh in favor of Garrison. First, he directed his statement, through the press, to the citizens of Westminster, not to another firefighter. "[W]e have acknowledged that a 'narrow, limited focus and [a] limited audience weigh against [a] claim of protected speech.'" *Brewster,* 149 F.3d at 981 (quoting *Roe,* 109 F.3d at 585). Furthermore, Garrison did not occupy a high-level, policy-making position, for which personal loyalty and confidentiality are indispensable. Were he in such a job, the City's interest in avoiding disruption would be enhanced. *See Moran,* 147 F.3d at 850 (making that observation with respect to employees who occupy a "confidential, policymaking, or public contact role") (citation and internal quotation marks omitted). Finally, there is no evidence in the record suggesting that Garrison's statement affected his own duties, impaired a close

working relationship, obstructed routine office operations, or threatened to have any such negative consequence. *Cf. Nunez v. Davis,* 169 F.3d 1222, 1228–29 (9th Cir.1999) (holding that the plaintiff's interest in exercising her right to speech clearly outweighed the employer's interest in maintaining an efficient workplace, when the jury found that the assertion of office disruption was not credible and the other reasons offered for termination were pretextual).

Defendants argue that two factors weigh against Garrison. First, defendants claim that Garrison made his statement with reckless disregard for the truth. *See Johnson v. Multnomah County,* 48 F.3d at 424 (holding that recklessness of expression may be considered in the *Pickering* balance, but that the public employer must make a showing of actual injury). On this record, we disagree.

It is true that Garrison issued the press release only about 15 to 17 hours after the fire, without firm knowledge of the time or cause of the victim's death. Investigators were still at the scene, and an autopsy of the victim had yet to be performed. However, Garrison's actions hardly can be characterized as reckless. Garrison learned about the Candlewood Fire from plaintiff Raphael, who was the battalion chief at the scene and a 23–year veteran firefighter. On the night of the fire and the following morning, Raphael told Garrison extensive details of the tragedy from his firsthand knowledge and expressed a belief based on his experience that, had the firefighters had an extra truck at the scene, the death could have been prevented. Raphael informed Garrison that a neighbor had heard screaming and moaning coming from the house as the firefighters were making their entry. The following morning, Garrison also consulted with two other firefighters, who had been inside the house, to verify Raphael's account. Garrison then discussed the fire with the members of the union's executive board,

each of whom agreed that a press release should issue. Garrison's repeated inquiries and consultations with professionals at the scene and with other firefighters before issuing the press release belies defendants' claim that he acted with reckless disregard for the truth.

Second, defendants claim that, although there is no evidence of *actual* disruption in the provision of fire services, it was reasonable for defendants to believe that Garrison's statement could have eroded the morale and the effectiveness of a fire department already embroiled in a political battle and beset by accusations of corruption. We are mindful that a public-safety organization, such as a fire department, has a "substantial interest in developing 'discipline, *esprit de corps*, and uniformity', to insure adequate 'promotion of safety of persons and property.'" *Kannisto*, 541 F.2d at 843 (making that observation as to a police department) (quoting *Kelley v. Johnson*, 425 U.S. 238, 246–47, 96 S.Ct. 1440, 47 L.Ed.2d 708 (1976)). Nevertheless, we are unpersuaded that such a prediction of disruption was reasonable in the unusual circumstances of this case. The statement at issue in no way criticized the abilities of fellow firefighters or accused them of any wrongdoing, *see, e.g., Janusaitis v. Middlebury Volunteer Fire Dep't*, 607 F.2d 17, 26 (2d Cir.1979) (involving allegations that the fire department had engaged in a "cover-up" to hide accounting irregularities; the district court had found that those accusations were a product of the plaintiff's "resentment" and "bitterness" toward senior officers of the fire department), nor did it pose any threat to internal discipline or to the chain of command, *see, e.g., Kannisto*, 541 F.2d at 842–44 (involving disrespectful and disparaging remarks about a superior officer made to subordinates during a morning inspection); *Shands v. City of Kennett*, 993 F.2d 1337, 1345 (8th Cir.1993) (involving statements about the quality of firefighting equipment and the need to hire a firefighter with specific qualifications; the court held that making those statements threatened "to

undermine the chief's authority" and "circumvented the chain of command"). As defendant Demonaco conceded, the morale of firefighters already was badly damaged because of the budget cuts and the public accusations of corruption. In such circumstances, Garrison's statement could have had, at most, a marginal impact on the firefighters' morale. Such a nominal showing of potential disruption is plainly inadequate to outweigh the heavy interests (1) of Garrison in speaking about the lack of readiness of the fire department and (2) of the citizens of Westminster in receiving such information.

Defendants additionally claim that Garrison's right to expression could not have been "clearly established," because his statement had the potential to expose the City to civil liability. Demonaco testified that he had thought that Garrison's statement was a "great libelous situation" that could have cost the taxpayers "a great deal of money." The district court relied on that factor; commenting on Garrison's statement, the district court stated, "If that is not pinning liability on the city, I don't know what it is."

On the facts of this case, defendants' claim that Garrison's statement could have exposed the City to liability falls short of the mark. As discussed, Garrison was responsible, not reckless, in issuing the Candlewood Fire press release. Moreover, defendants produced no evidence that Garrison's statement resulted in any actual injury to the City. *See Johnson v. Multnomah County*, 48 F.3d at 424 (stating that, in the *Pickering* balance, courts may consider the "*actual damage* done to the government by the reckless statement") (emphasis added). The danger in lowering the bar of protection for true or nonreckless speech that merely *might* expose a public employer to liability is that it "may inhibit the flow of accurate information from public employees who are uncertain about whether they have accumulated a legally sufficient factual basis for their state-

ments." *Id.* Indeed, this court has recognized that there is a significant First Amendment interest in encouraging public employees, who are positioned uniquely to contribute to the debate on matters of public concern, to speak out about what they think and know without fear of retribution, so that citizens may be informed about the instruments of self-governance. *See, e.g., id.* We conclude that the concern-over-liability factor does not weigh against Garrison in the *Pickering* balance.

■ Finally, we address a variable that is not part of the traditional *Pickering* balance, but that defendants have raised here: reliance on counsel. Both Demonaco and Huntley testified that they consulted with counsel before discharging Garrison because of his press release. Huntley even went so far as to read a Supreme Court opinion himself, before determining that Garrison had exceeded the permissible bounds of protected public-employee speech. Although such efforts are laudable, standing alone they do not bestow on public officials the shield of qualified immunity. *See Lucero v. Hart,* 915 F.2d 1367, 1371 (9th Cir.1990) ("While *reliance on counsel's advice will not satisfy a defendant's burden of acting reasonably,* it is evidence of defendant's good faith.") (emphasis added); *see also Nunez,* 169 F.3d at 1230 (holding that advice of counsel is not dispositive on the issue of reasonableness). Were we to rule that reliance on the advice of counsel is sufficient to confer qualified immunity, no matter what the outcome of the *Pickering* balance, we would be abdicating to individual lawyers our collective judicial responsibility to evaluate the merits of First Amendment retaliation claims and providing an incentive for lawyers to tell public-employer clients that they have

immunity even when other factors suggest the absence of immunity.

In summary, on the record before us, we conclude that the *Pickering* balance so clearly weighs in favor of Garrison that it was patently unreasonable for defendants to conclude that the First Amendment did not protect his speech. Accordingly, we reverse the district court's grant of defendants' Rule 50(a) motion as to Garrison's retaliation claims and remand those claims for further proceedings.

### B. Equal Protection Claims

#### 1. Grant of Defendants' Rule 50(b) Motion [15]

■ The jury found that certain defendants (Demonaco, Anderson, Smith, Schweisinger, Lam, and Mayhew) were liable for denying plaintiffs Herr, Wilson, Bowler, and Raphael equal protection of the law, in violation of the Fourteenth Amendment. However, after trial, the district court granted defendants' Rule 50(b) motion as to those claims on the ground that there was insufficient evidence of an equal protection violation. Specifically, the district court held that there was insufficient evidence from which the jury could compare the class of plaintiffs to a class of similarly situated nonplaintiffs.

Having conducted a *de novo* review of the record, *see Lawson,* 139 F.3d at 692 (stating that standard of review), we agree with the district court that plaintiffs failed to produce legally sufficient evidence to support their equal protection claims. Consequently, we do not address the more interesting (and difficult) legal question posed by defendants: Can differential treatment on the basis of expressive activity give rise to an equal protection claim, separate and apart from a claim of First Amendment retaliation? [16]

**15.** Garrison's equal protection claim was not before the district court as part of defendants' Rule 50(b) motion, because the district court already had dismissed his claim at the close of plaintiffs' case-in-chief. We consider the merits of Garrison's equal protection claim in this section, however, because it involves the

same legal issues that are raised in connection with the grant of defendants' Rule 50(b) motion.

**16.** Other courts have split on that question. *Compare Watkins v. Bowden,* 105 F.3d 1344, 1354 (11th Cir.1997) (holding that no inde-

"The Equal Protection Clause directs that all persons similarly circumstanced shall be treated alike." *Plyler v. Doe*, 457 U.S. 202, 216, 102 S.Ct. 2382, 72 L.Ed.2d 786 (1982) (citation and internal quotation marks omitted); *see also Mlikotin v. City of Los Angeles*, 643 F.2d 652, 654 (9th Cir.1981) (stating that the allegation of "unequal treatment of persons similarly situated ... [is] the gravamen of a complaint for denial of equal protection"). Plaintiffs identified as the class of similarly situated persons those nonplaintiff firefighters whom the City had not terminated for violating the PTF policy and who were less politically active than plaintiffs. In other words, plaintiffs claimed that the City disciplined them more harshly than it disciplined policy-violating firefighters who had engaged in less First Amendment activity.

Other than general evidence that many firefighters had attended rallies, had walked precincts, and had distributed petitions, there was no evidence fixing the specific level of First Amendment activity engaged in by nonplaintiff firefighters. Plaintiffs argue that the jury could *infer* that other firefighters were less active in the union's political battles, simply because they did not figure prominently in the testimony. Such an inference from lack of evidence would amount to no more than speculation, however. The burden was on plaintiffs to produce affirmative proof that other firefighters were less active politically and, because of that inactivity, received favorable treatment. *See Gehl Group v. Koby*, 63 F.3d 1528, 1538 & n. 14 (10th Cir.1995) (holding that, in a civil rights

pendent equal protection claim exists when the plaintiff has done no more than restate his or her claim of retaliation as a claim of equal protection), *Thompson v. City of Starkville*, 901 F.2d 456, 468 (5th Cir.1990) (same), *Vukadinovich v. Bartels*, 853 F.2d 1387, 1391–92 (7th Cir.1988) (same), *and Grossbaum v. Indianapolis–Marion County Bldg. Auth.*, 100 F.3d 1287, 1296 n. 8 (7th Cir.1996) (suggesting, in *dictum*, that no independent equal protection claim exists), *cert. denied*, 520 U.S. 1230, 117 S.Ct. 1822, 137 L.Ed.2d 1030

claim for selective prosecution, the burden of proof rests on plaintiffs to show (1) that the defendant singled them out for prosecution while other similarly situated groups were not for equivalent conduct and (2) that the discriminatory selection was invidious and based on the plaintiffs' exercise of First Amendment rights). Accordingly, there was no legally sufficient evidence in the record to support the jury's verdicts in favor of plaintiffs on their equal protection claims. The district court did not err in granting defendants' Rule 50(b) motion. .

### 2. *Exclusion of Evidence*

Plaintiffs further argue that, if there was insufficient evidence to support the jury's verdict on their equal protection claims, then the district court was to blame. That is so, plaintiffs contend, because the district court erroneously refused to admit evidence regarding certain other firefighters. Because of that alleged error, plaintiffs demand a new trial.

We have reviewed the record and the alleged instances of evidentiary error. In none of those instances did plaintiffs offer evidence that would have cured the fatal deficiency of their case: the lack of evidence regarding the types and levels of protected activities engaged in by nonplaintiff firefighters, whom the City disciplined but did not fire. Even if the district court did commit the evidentiary errors asserted by plaintiffs, none of those errors was prejudicial so as to warrant a new trial, nor were they prejudicial in combination. *See Heyne*, 69 F.3d at 1478 (holding

(1997), *with Gehl Group v. Koby*, 63 F.3d 1528, 1538 (10th Cir.1995) (observing that a civil claim of selective prosecution based on protected speech "could implicate equal protection concerns, just as it could First Amendment concerns"). *See also Police Dep't of Chicago v. Mosley*, 408 U.S. 92, 94–96, 92 S.Ct. 2286, 33 L.Ed.2d 212 (1972) (analyzing under the Equal Protection Clause a picketing ordinance that, on its face, differentiated between similarly situated groups based on the subject matter of the group's expression):

that, in the absence of prejudice, a new trial is not warranted).

### 3. *Jury Instruction on Equal Protection*

Last, plaintiffs argue that a new trial is warranted as to plaintiff Gilbrook, whose equal protection claim the jury rejected on the facts, because the district court admitted that its jury instruction on equal protection was erroneous and prejudicial. However, as discussed, there was legally insufficient evidence to support *any* of plaintiffs' equal protection claims. A proper jury instruction would not have cured that deficiency.

### C. *Conclusion on Plaintiffs' Cross-Appeal*

In summary, in plaintiffs' cross-appeal, No. 96–56375, (1) we reverse the grant of defendants' Rule 50(a) motion as to Garrison's retaliation claims and remand those claims for further proceedings, and (2) we affirm the entry of judgment as a matter of law in favor of defendants as to all plaintiffs' equal protection claims.

## IV. THE FEE APPEAL (NO. 97–55314)

■■■ As the only "prevailing parties" under 42 U.S.C. § 1988,[17] plaintiffs Herr and Wilson moved for attorney fees and costs pursuant to that statute. The district court granted plaintiffs' motion, awarding reasonable attorney fees and costs directly to Herr and Wilson in the sum of $977,166.68. However, instead of assigning that award to their trial lawyers, Davis, Reno & Courtney (intervenor), who earlier had withdrawn as counsel because of unpaid fees, Herr and Wilson kept the award on the advice of their appellate counsel.

Before us now are two matters relating to the district court's award of fees and costs. First, defendants appeal from the district court's judgment as to fees and costs, contesting the amounts awarded to Herr and Wilson. Second, intervenor argues that the district court erred by awarding the fees and costs directly to Herr and Wilson rather than to intervenor. We turn first to intervenor's sole assignment of error and then consider defendants' various arguments concerning the reasonableness of the fee award.

### A. *Entitlement to the Fee Award*

■■■ Intervenor asserts that, although the district court properly granted plaintiffs' motion for attorney fees and costs, the district court erred by ordering payment of that award directly to plaintiffs, instead of directly to counsel. Intervenor argues that, under the logic of this court's decision in *United States ex rel. Virani v. Jerry M. Lewis Truck Parts & Equipment, Inc.*, 89 F.3d 574 (9th Cir. 1996), the payment of attorney fees awarded under § 1988 must be made directly to the plaintiff's counsel. To hold otherwise, intervenor reasons, would frustrate the underlying purpose of § 1988: to encourage private enforcement of the civil rights laws. We review *de novo* a district court's interpretation of a fee-shifting statute. *See id.* at 576 (stating that standard of review).

We begin our analysis, as always, with the words of the statute. Section 1988 provides that "the court, in its discretion, may allow the *prevailing party* . . . a reasonable attorney's fee" in actions brought pursuant to certain enumerated civil rights statutes, including the relevant statute in this case, § 1983. 42 U.S.C. § 1988 (emphasis added). The emphasized wording suggests that a fee is allowed to the party, rather than to the party's lawyer.

Additionally, two Supreme Court decisions inform our interpretation of § 1988.

---

**17.** For purposes of § 1988, a civil rights plaintiff "prevails" "when actual relief on the merits of his claim materially alters the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." *Farrar v. Hobby*, 506 U.S. 103, 112, 113 S.Ct. 566, 121 L.Ed.2d 494 (1992).

In *Evans v. Jeff D.*, 475 U.S. 717, 106 S.Ct. 1531, 89 L.Ed.2d 747 (1986), the Court held that attorney fees under § 1988 may be waived as part of a civil rights class action settlement. In so holding, the Court observed that "the language of [§ 1988], as well as its legislative history, indicates that Congress bestowed on the 'prevailing *party*' (generally plaintiffs) a statutory eligibility for a discretionary award of attorney's fees in specified civil rights actions." *Id.* at 730, 106 S.Ct. 1531 (footnote omitted) (emphasis in original). The Court further stated that,

> while it is undoubtedly true that Congress expected fee shifting to attract competent counsel to represent citizens deprived of their civil rights, *it neither bestowed fee awards upon attorneys* nor rendered them nonwaivable or nonnegotiable; instead, it added them to the arsenal of remedies available to combat violations of civil rights, a goal not invariably inconsistent with conditioning settlement on the merits on a waiver of statutory attorney's fees.

*Id.* at 731–32, 106 S.Ct. 1531 (footnotes omitted) (emphasis added); *see also Willard v. City of Los Angeles*, 803 F.2d 526, 527 (9th Cir.1986) (holding, in the light of *Jeff D.*, that "an attorney has no standing under section 1988 to seek attorney's fees in his own behalf").

A few years later, in *Venegas v. Mitchell*, 495 U.S. 82, 110 S.Ct. 1679, 109 L.Ed.2d 74 (1990), the Supreme Court reaffirmed its view that it is the civil rights plaintiff, not the civil rights lawyer, who is entitled to a fee award under § 1988. *Venegas* dealt with the question whether § 1988 invalidated "contingent-fee contracts that would require a prevailing civil rights plaintiff to pay his attorney more than the statutory award against the defendant." *Id.* at 83–84, 110 S.Ct. 1679 (footnote omitted). In holding that such private fee arrangements were consistent with § 1988, *see id.* at 90, 110 S.Ct. 1679 (stating holding), the Court observed that "*it is the party, rather than the lawyer*"

who is eligible for fees under the statute. *Id.* at 87, 110 S.Ct. 1679 (emphasis added). The Court further commented that, "just as we have recognized that it is the party's entitlement to receive the fees in the appropriate case, so have we recognized that as far as § 1988 is concerned, it is the party's right to waive, settle, or negotiate that eligibility." *Id.* at 88, 110 S.Ct. 1679.

Despite the precedent holding that only the civil rights plaintiff is entitled to receive fees under § 1988, intervenor insists that, once awarded, the payment of such fees should be made directly to the plaintiff's counsel. Intervenor relies mainly on *Virani* to support its claim. In that case, this court addressed the same question posed here, but with respect to a *qui tam* action under the False Claims Act (FCA), which also provides for an award of attorney fees to successful plaintiffs. *See* 31 U.S.C. § 3730(d)(1). Although a unanimous panel agreed that, *on the facts of the case*, the attorney fee award had to go directly to the plaintiff's lawyers, only two members of the panel concurred in the holding that, *in all circumstances*, the payment of fees under the FCA must be made directly to the plaintiff's counsel. The two-judge majority reasoned:

> [O]nly the plaintiff has the power to demand that the defendant pay the fees of the plaintiff's attorney. Unless and until the plaintiff exercises that power, no one has the right to collect fees from the defendant, and the defendant has no duty to pay them. Once the power is exercised, however, the attorneys' right vests, and the defendant's duty becomes fixed. The work was done by and the fees are for the plaintiff's attorney. They must be directed to the attorney. Were the rule otherwise, plaintiffs would obtain possession of fee awards, and attorneys would be left to attempt to obtain the money paid for their services as best they could. Left to the normal vicissitudes of life, substantial sums would be diverted from their intended purpose.

*Virani,* 89 F.3d at 578–79 (footnotes and citation).

In a concurrence, Judge Thomas advocated a different interpretation of the fee-shifting provision of the FCA. He wrote that the "clear import of case law is that (1) statutory attorneys' fee awards are bestowed upon the party, not the attorney and (2) such awards are separate and distinct from the contractual relationship between the attorney and client." *Id.* at 581 (Thomas, J., concurring) (footnote omitted). He concluded that, "absent a contractual assignment to the attorney, the False Claims Act requires payment of the attorneys' fee award to the party, with the ultimate disposition of the award dependent upon the contract between the attorney and client." *Id.* at 580 (Thomas, J., concurring). Judge Thomas concurred with the majority's result because the parties had entered into a retainer agreement, which provided that the attorney would be assigned all fees and costs awarded by the court.

Intervenor contends that the *Virani* majority's rationale applies equally to fee awards under § 1988. *Cf. Dennis v. Chang,* 611 F.2d 1302, 1306 (9th Cir.1980) ("Congress' purpose in authorizing fee awards [under § 1988] was to encourage compliance with and enforcement of the civil rights laws.") (footnote omitted). We conclude, however, that the majority's rationale in *Virani* does not apply to all federal fee-shifting statutes and, in particular, does not apply to fee awards under § 1988.

In *Image Technical Service, Inc. v. Eastman Kodak Co.,* 136 F.3d 1354 (9th Cir.1998), this court considered whether attorney fees awarded under the Clayton Act's fee-shifting provision, 15 U.S.C. § 15(a), should be paid directly to the successful party's counsel or to the successful party itself. The court held that "[a]ny fee award in an antitrust case goes to the successful plaintiff, not to plaintiff's counsel." *Id.* at 1357. In so holding, this court rejected the application of the *Virani* ma-

jority's rationale to the Clayton Act, noting that Judge Thomas' concurrence in *Virani* "adheres to reasoning closer to that found in antitrust fee cases." *Id.* at 1359. The same, we think, is true of fees awarded under § 1988.

There are significant differences between a fee award under § 1988 and a fee award in a *qui tam* action. First, the Supreme Court of the United States has spoken with respect to fees under § 1988. As the Court said unequivocally in *Jeff D.,* Congress chose not to "bestow[ ] fee awards upon attorneys." 475 U.S. at 731–32, 106 S.Ct. 1531. No policy argument and no Ninth Circuit case can override the Supreme Court's interpretation.

Second, the functional difference between a civil rights claim and a *qui tam* action suggests that a different result is appropriate. In the latter type of action, a substantial portion of the damages collected goes to the federal government, not to the *qui tam* plaintiff, as compensation for the acts of fraud committed by the defendant against the federal government. *See Virani,* 89 F.3d at 578 (so noting). Thus, as discussed in *Virani,* it is particularly important in *qui tam* actions that attorney fees actually go to the *qui tam* lawyer and not to the *qui tam* plaintiff. If they did not, the government would be denied compensation to which it otherwise would be entitled. *Id.* That governmental-harm concern simply is not present in individual civil rights actions.

Third, even if we were free to consider policy concerns, denying civil rights lawyers a direct payment of fee awards is consistent with § 1988's purpose of attracting competent counsel to represent civil rights plaintiffs. As the Court said in *Venegas,* civil rights lawyers can protect their interest in a fee award simply by executing contracts. *See* 495 U.S. at 90, 110 S.Ct. 1679 ("Section 1988 itself does not interfere with the enforceability of a contingent-fee contract.").

■ In short, we think that Judge Thomas' view of federal fee-shifting statutes better reflects the wording of § 1988 and the authorities interpreting that statute. In the absence of a contractual assignment to counsel, § 1988 requires that attorney fee awards be made directly to the prevailing party, with the ultimate disposition of the award dependent on the contract between the lawyer and the client.

Here, Herr and Wilson did not enter into a retainer agreement with intervenor providing that any monies awarded to plaintiffs as "prevailing parties" under § 1988 would be assigned to intervenor. Accordingly, the district court did not err by awarding attorney fees and costs directly to Herr and Wilson.

### B. *Reasonableness of Fees*

■ We turn next to defendants' challenges to several aspects of the district court's award of fees and costs. "While awards of attorney's fees pursuant to 42 U.S.C. § 1988 are generally reviewed for abuse of discretion, any elements of legal analysis and statutory interpretation which figure in the district court's decision are reviewable *de novo*." *Cabrales v. County of Los Angeles*, 935 F.2d 1050, 1052 (9th Cir.1991) (citations and internal quotation marks omitted).

### 1. *Fees for Activities Related to the OCFA*

■ Defendants first object to that portion of the fee award compensating plaintiffs for intervenor's various efforts related to the City's contracting out of fire services to the OCFA. The relevant facts are not in dispute.

Shortly before trial, the City decided to disband the fire department. The City executed a contract with the OCFA to provide fire services to the community. Plaintiffs claimed that the decision was in furtherance of defendants' conspiracy to retaliate against plaintiffs. Additionally, the OCFA contract contained a clause precluding anyone who had been discharged

by the City's fire department from obtaining work with the OCFA. That provision affected the employment eligibility of four plaintiffs—Garrison, Gilbrook, Herr, and Raphael—each of whom the City had terminated. Intervenor's billing records show that, from May 1995 through July 1995, intervenor engaged in negotiations with defendants to settle the civil rights claims of the terminated plaintiffs and to secure their employment eligibility with the OCFA. A federal magistrate judge acted as mediator in those negotiations. When those efforts failed, plaintiffs sought a temporary restraining order (TRO) to enjoin enforcement of the City's contract with the OCFA. The trial judge heard that motion and granted it, but then denied plaintiffs' request for a preliminary injunction. Plaintiffs then sought a second TRO, which the district court denied.

In ruling on plaintiffs' motion for fees, the district court held that, under *Cabrales*, intervenor's *litigation* efforts relating to the OCFA were compensable, because they constituted "[e]fforts to preserve the remedy of reinstatement and efforts to encourage settlement in the case [which], though ineffective, contributed to the ultimate success in the lawsuit." Moreover, relying on *Davis v. City & County of San Francisco*, 976 F.2d 1536 (1992), *vacated in part on other grounds on denial of reh'g*, 984 F.2d 345 (9th Cir.1993), the district court held that intervenor's *extra-litigation* efforts involving the OCFA were compensable for another reason, because they "directly and intimately related to protecting reinstatement as a remedy and encouraging settlement." *See id.*, 976 F.2d at 1545 (holding that prevailing civil rights counsel are entitled to compensation for work that is "directly and intimately related to the successful representation of a client").

Defendants attack several aspects of the OCFA-related fee award. First, defendants argue that the district court misap-

plied *Cabrales,* because intervenor's efforts to enjoin the enforcement of the City's contract for fire services with the OCFA were "wholly collateral" to plaintiffs' ultimate victory. Moreover, defendants complain that the district court misapplied *Davis,* because certain of the OCFA related fees involved nonlitigation efforts that did not contribute, directly and substantially, to the attainment of plaintiffs' litigation goals. Finally, defendants claim that the OCFA-related fees should be vacated or, alternatively, reduced, because an actual conflict of interest tainted intervenor's representation of plaintiffs. We consider each argument in turn.

*Cabrales* involved the question whether a prevailing plaintiff is entitled to attorney fees incurred during an unsuccessful stage of the same litigation. This court held that "a plaintiff who is unsuccessful at a stage of a litigation that was a necessary step to her ultimate victory is entitled to attorney's fees even for the unsuccessful stage." 935 F.2d at 1053. In so holding, this court observed that "[l]awsuits usually involve many reasonably disputed issues and a lawyer who takes on only those battles he is certain of winning is probably not serving his client vigorously enough; losing is a part of winning." *Id.* In view of that reality, the court acknowledged that, as a general rule, "plaintiffs are to be compensated for attorney's fees incurred for services that contribute to the ultimate victory in the lawsuit." *Id.* at 1052.

■ The district court ruled that the hours spent by intervenor opposing the OCFA contract contributed to the ultimate success of the lawsuit, because they preserved the remedy of reinstatement and encouraged settlement of the case. Deference to the district court's awarding of fees is "appropriate in view of the district court's superior understanding of the litigation and the desirability of avoiding frequent appellate review of what essentially are factual matters." *Hensley v. Eckerhart,* 461 U.S. 424, 437, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). That principle is par-

ticularly applicable here, where the trial judge presided ably over every aspect of this litigation, from the filing of the complaint to the post-trial motions. He was intimately familiar with the facts, the issues, and the parties' efforts. Defendants have pointed to nothing in the record that convinces us that intervenor's OCFA-related litigation efforts were "wholly collateral" to the present action. We, therefore, do not disturb that portion of the fee award.

Defendants next object to a minor portion of the fee award, totaling less than $500, which compensates plaintiffs for work relating to the OCFA's physical examination requirements and the retirement benefits available to OCFA firefighters. The district court held that, under *Davis,* such work was compensable, because it constituted extra-litigation efforts directly and intimately related to protecting reinstatement as a remedy and encouraging settlement. Plaintiffs explain that the contested hours were necessary to determine whether reinstatement was a workable remedy: If plaintiffs could not meet the physical examination requirements or if the retirement benefits were less than satisfactory, reinstatement might not have been a beneficial option to pursue. Once again, because of the district court's intimate familiarity with this litigation, as well as with the factors that led to plaintiffs' ultimate success, we defer to the district court's discretion on this matter.

■ Finally, defendants argue for the first time on appeal that the fee award should be vacated or reduced, because intervenor provided legal services to plaintiffs under an actual conflict of interest. Defendants assert that the conflict issue is purely an issue of law, which may be reviewed for the first time on appeal. *See United States v. Carlson,* 900 F.2d 1346, 1349 (9th Cir.1990) (stating that an issue may be heard for the first time on appeal when "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise

the issue in the trial court"). We do not agree.

■ A claim of conflict of interest on the part of counsel is a mixed question of fact and law. *See Garcia v. Bunnell,* 33 F.3d 1193, 1195 (9th Cir.1994) (stating the standard of review for claims of conflict of interest on habeas review). Ordinarily, we would review the district court's findings of fact deferentially, for clear error. Here, however, because defendants have raised the conflict question for the first time on appeal, neither plaintiffs nor the district court had an opportunity to develop the record regarding the alleged conflict. We, therefore, decline to consider defendants' conflict-of-interest argument.

### 2. *Press Releases and Public Relations Activities*

■ Next, defendants challenge approximately 25 hours of time billed by intervenor for media and public relations activities. Prevailing civil rights counsel are entitled to fees for "press conferences and performance of other lobbying and public relations work" when those efforts are "directly and intimately related to the successful representation of a client." *Davis,* 976 F.2d at 1545.

Here, the district court determined that intervenor's work contributed directly and substantially to plaintiffs' litigation goals. The district court reasoned that "[l]ocal politics had a potentially determinative influence on the outcome of settlement negotiations and the availability of certain remedies such as reinstatement." The district court further stated that "plaintiffs believed the efforts to disband the Westminster Fire Department were part of the retaliatory scheme, and plaintiffs

reasonably used public relations and political lobbying efforts to prevent additional retaliation against plaintiffs prior to the conclusion of this action."

After a review of the relevant billing records, we conclude that the district court did not abuse its discretion by granting fees for media and public relations activities insofar as those activities contributed directly and substantially to plaintiffs' attainment of favorable jury verdicts. The hours spent by intervenor publicizing those verdicts were not compensable, however. *See id.* (suggesting that, on remand, the district court disallow fees for media appearances made by counsel after the attainment of the plaintiff's litigation goals). Therefore, on remand the district court must deduct from the fee award those hours devoted to post-verdict media activities.

### C. *The Absence of a Fee Agreement*

■ At long last, we reach the final issue. Defendants assert that a "special circumstance" exists in this case, warranting a remand to the district court for reconsideration of the fee award. Specifically, defendants contend that they learned for the first time on appeal that intervenor "had no written fee agreement, in fact no agreement at all, with Herr and Wilson, in violation of California law." That "special circumstance," defendants claim, justifies vacating the fee award and directing the trial court to recalculate the award according to the hourly fees that intervenor actually charged to plaintiffs, not what the district court deemed to be a reasonable fee.[18]

18. In its discretion, the district court calculated the attorney fee award using an hourly rate higher than that actually charged by intervenor. *See Blanchard v. Bergeron,* 489 U.S. 87, 92, 109 S.Ct. 939, 103 L.Ed.2d 67 (1989) ("Whether or not [a litigant] agreed to pay a fee and in what amount is not decisive [to determining a fee award]. ... Such arrangements should not determine the court's deci-

sion. The criterion for the court is not what the parties agree but what is reasonable.") (citation and internal quotation marks omitted). Defendants have not challenged the district court's use of a higher hourly rate except insofar as they make the "special circumstances" argument. That is, they never have argued that the hourly rate is unreasonable.

As a threshold matter, we assume, without deciding, that defendants did not waive this argument of law by failing to raise it before the district court. Defendants' "special circumstances" claim is unpersuasive.

The "special circumstance" exception derives from *Newman v. Piggie Park Enterprises, Inc.*, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). There, the Supreme Court observed that the prevailing party in civil rights actions "should ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." *Id.* at 402, 88 S.Ct. 964. This court has examined two factors in determining whether a case involves a "special circumstance" justifying the denial of fees: (1) whether allowing attorney fees would further the purposes of § 1988 and (2) whether the balance of the equities favors or disfavors the denial of fees. *See Seattle Sch. Dist. v. Washington*, 633 F.2d 1338, 1348 (9th Cir.1980), *aff'd*, 458 U.S. 457, 102 S.Ct. 3187, 73 L.Ed.2d 896 (1982). Defendants do not seriously contend, nor can they, that the award of fees in this case undermines the purposes of § 1988. Rather, they argue that, in the absence of a retainer agreement, it was inequitable for the district court to calculate the fee award using a "reasonable" hourly rate that was higher than the rate that intervenor actually charged.

In answering defendants' argument, *Virani* is instructive. There, the defendant challenged the award of attorney fees on the ground that counsel had entered into an unconscionable fee agreement with the plaintiff. This court held:

> When that kind of claim has been made, California courts have not denied fees in their entirety. They have simply refused to enforce the improper agreement itself. Nevertheless, attorneys were still allowed to recover the reasonable value of their services.
>
> In light of California law, even if there were some impropriety in the fee arrangement between [counsel] and [the plaintiff], [the defendant] cannot prevail. [Counsel] would still be entitled to recover the reasonable value of its services, and that is all [the defendant] has been required to pay. We appreciate [the defendant's] concern that [the plaintiff] be treated fairly when attorneys enter into fee arrangements with him, but, again, that does not affect the amount of the fee which it must pay.

89 F.3d at 580 (citations omitted).

As in *Virani*, defendant has accused intervenor of no more than an unlawful fee arrangement with plaintiffs, indeed, no fee arrangement at all. In that circumstance, even assuming intervenor's conduct to be improper (which is not at all clear), plaintiffs Herr and Wilson still would be entitled to the reasonable value of their lawyers' services under California law. That is what they received.

## CONCLUSION

Our holdings, in summary form, are as follows:

1. In defendants' main appeal, No. 96–56306, the denial of defendants' Rule 50(b) motion as to plaintiff Herr's and plaintiff Wilson's claims of retaliation is **AFFIRMED**; the verdict in favor of plaintiff Gilbrook on his state-law claim of slander per se is **VACATED AND REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT FOR DEFENDANT Schweisinger**; the order granting a new trial as to plaintiff Bowler's claims of retaliation is **REVERSED AND REMANDED WITH INSTRUCTIONS TO ENTER JUDGMENT FOR DEFENDANTS**.

2. In plaintiffs' cross-appeal, No. 96–56375, the grant of defendants' Rule 50(a) motion as to plaintiff Garrison's claims of retaliation is **REVERSED AND THOSE CLAIMS ARE REMANDED FOR FURTHER PROCEEDINGS**; the grant of defendants' Rule 50(b) motion as to plaintiffs' equal protection claims is **AFFIRMED**; the grant of defendants' Rule 50(a) motion

as to plaintiff Garrison's equal protection claim is **AFFIRMED.**

3. In defendants' fee appeal, No. 97–55314, the award of attorney fees and costs directly to plaintiff Herr and plaintiff Wilson is **REVERSED** insofar as it awards fees for intervenor's post-verdict media and public relations activities and is **OTHERWISE AFFIRMED.**

Each party will bear its own costs on appeal.